[938 NE2d 941, 912 NYS2d 508]

MARC S. KIRSCHNER, as Trustee of the REFCO LITIGATION TRUST, Appellant, v KPMG LLP et al., Respondents, et al., Defendants.

TEACHERS' RETIREMENT SYSTEM OF LOUISIANA et al., Derivatively on Behalf of Nominal Defendant AMERICAN INTERNATIONAL GROUP, INC., Appellants, v PRICEWATERHOUSECOOPERS LLP, Respondent.

Argued September 14, 2010; decided October 21, 2010

## POINTS OF COUNSEL

*Quinn Emanuel Urquhart & Sullivan, LLP,* New York City (*Kathleen M. Sullivan, Richard I. Werder, Jr., Sascha N. Rand, Sanford I. Weisburst, K. McKenzie Anderson, Sarah Rubin* and *Simona Gory* of counsel), for appellant in the first above-entitled action. I. Insider misconduct is not relevant to a corporate successor's standing to sue, but at most provides an affirmative defense on the merits. (*Shearson Lehman Hutton, Inc. v Wagoner,* 944 F2d 114; *Barnes v Hirsch,* 215 App Div 10, *affd sub nom. Barnes v Schatzkin,* 242 NY 555; *In re Petroleum Corp. of Am.,* 417 F2d 929; *Caplin v Marine Midland Grace Trust Co.,* 406 US 416; *In re Senior Cottages of Am., LLC,* 482 F3d 997; *Baena v KPMG LLP,* 453 F3d 1; *Matter of Smith Barney, Harris Upham & Co. v Luckie,* 85 NY2d 193; *Symbol Tech., Inc. v Deloitte & Touche, LLP,* 69 AD3d 191; *Capital Wireless Corp. v Deloitte & Touche,* 216 AD2d 663; *Buechner v Avery,* 38 AD3d 443.) II. The trustee plausibly alleged that the corrupt insiders' misconduct should not be imputed to the trustee at the pleading stage because they acted adversely to Refco's interests. (*Center v Hampton Affiliates,* 66 NY2d 782; *Cenco Inc. v Seidman &*

*Seidman,* 686 F2d 449; *In re Crazy Eddie Sec. Litig.,* 802 F Supp 804; *Marine Midland Bank v Russo Produce Co.,* 50 NY2d 31; *Fundamental Portfolio Advisors, Inc. v Tocqueville Asset Mgt., L.P.,* 7 NY3d 96; *Bluebird Partners v First Fid. Bank,* 94 NY2d 726; *Farr v Newman,* 14 NY2d 183; *Henry v Allen,* 151 NY 1; *In re Phar-Mor, Inc. Sec. Litig.,* 900 F Supp 784; *In re Investors Funding Corp. of N.Y. Sec. Litig.,* 523 F Supp 533.) III. Defendants who knowingly participate or acquiesce in company misconduct or professional defendants who act negligently may not invoke company misconduct as a defense, and in any event such a defense is not a total defense. (*Battalla v State of New York,* 10 NY2d 237; *Ehrgott v Mayor of City of N.Y.,* 96 NY 264; *Arbegast v Board of Educ. of S. New Berlin Cent. School,* 65 NY2d 161; *Duval v Wellman,* 124 NY 156; *Irwin v Curie,* 171 NY 409; *Bateman Eichler, Hill Richards, Inc. v Berner,* 472 US 299; *Cenco Inc. v Seidman & Seidman,* 686 F2d 449; *Schacht v Brown,* 711 F2d 1343; *Talmage v Pell,* 7 NY 328; *Scholes v Lehmann,* 56 F3d 750.)

*Wilmer Cutler Pickering Hale and Dorr LLP,* New York City (*Philip D. Anker, Anne K. Small* and *Jeremy S. Winer* of counsel), *Winston & Strawn LLP,* Chicago, Illinois (*Linda T. Coberly* and *Bruce R. Braun* of counsel), *Wilmer Cutler Pickering Hale and Dorr LLP,* Washington, D.C. (*Paul R.Q. Wolfson* and *Daniel P. Kearney, Jr.,* of counsel), *Clifford Chance US LLP,* New York City (*Anthony Candido* of counsel), *Davis Polk & Wardwell LLP* (*Robert F. Wise, Jr.,* and *Paul Spagnoletti* of counsel), *King & Spalding LLP* (*James J. Capra, Jr.,* and *James P. Cusick* of counsel), *King & Spalding LLP,* Washington, D.C. (*Kenneth Y. Turnbull* of counsel), *Marino, Tortorella & Boyle, P.C.,* Chatham, New Jersey (*Kevin H. Marino* and *John D. Tortorella* of counsel), *Williams & Connolly LLP,* Washington, D.C. (*John K. Villa, George A. Borden* and *Craig D. Singer* of counsel), and *Howrey LLP,* New York City (*Kevin A. Burke, Gary F. Bendinger* and *Sarah D. Abeles* of counsel), for respondents in the first above-entitled action. I. The adverse interest exception applies only if the agent totally abandoned the principal's interests. (*Henry v Allen,* 151 NY 1; *Cragie v Hadley,* 99 NY 131; *Center v Hampton Affiliates,* 66 NY2d 782; *Ruggles v American Cent. Ins. Co. of St. Louis,* 114 NY 415; *Andre Romanelli, Inc. v Citibank, N.A.,* 60 AD3d 428; *Price v Keyes,* 62 NY 378; *Reynolds v Snow,* 10 AD2d 101, 8 NY2d 899; *Wight v BankAmerica Corp.,* 219 F3d 79; *Baena v KPMG LLP,* 453 F3d 1; *Fehribach v Ernst & Young LLP,* 493 F3d 905.) II. The adverse interest exception does not apply when the insiders who engaged in the fraud were

the corporation's owners and decisionmakers. (*Wight v Bank-America Corp.*, 219 F3d 79; *546-552 W. 146th St. LLC v Arfa*, 54 AD3d 543; *Morgado Family Partners, LP v Lipper*, 6 Misc 3d 1014[A], 2004 NY Slip Op 51791[U], 19 AD3d 262; *In re Mediators, Inc.*, 105 F3d 822; *In re Parmalat Sec. Litig.*, 477 F Supp 2d 602; *American Tissue, Inc. v Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F Supp 2d 79; *American Tissue, Inc. v Arthur Andersen, L.L.P.*, 275 F Supp 2d 398; *First Natl. Bank of Cicero v Lewco Sec. Corp.*, 860 F2d 1407; *In re Bennett Funding Group, Inc.*, 336 F3d 94; *Ash v Georgia-Pacific Corp.*, 957 F2d 432.) III. The Court should decline the trustee's request to impose dramatic and improvident legal change through issues that the trustee did not preserve and that the Second Circuit Court of Appeals did not certify. (*Shearson Lehman Hutton, Inc. v Wagoner*, 944 F2d 114; *Singleton v Wulff*, 428 US 106; *Noonan v Staples, Inc.*, 561 F3d 4; *Shady Grove Orthopedic Assoc., P.A. v Allstate Ins. Co.*, 549 F3d 137; *Tunick v Safir*, 94 NY2d 709; *Mary Lincoln Candies, Inc. v Department of Labor*, 289 NY 262; *Bullmore v Ernst & Young Cayman Is.*, 20 Misc 3d 667; *Hearst v Shea*, 156 NY 169; *Rufino v United States of Am.*, 69 NY2d 310; *390 W. End Ave. Assoc. v Youngstein*, 221 AD2d 292.)

*Cohen & Gresser LLP*, New York City (*Lawrence T. Gresser, Nathaniel P.T. Read* and *Lawrence J. Lee* of counsel), for William Wilson Bratton and others, amici curiae in the first above-entitled action. I. Imputation provides a bridge to consideration of affirmative defenses and is not a standing doctrine. (*Benedict v Arnoux*, 154 NY 715; *Green v des Garets*, 210 NY 79; *News Am. Mktg., Inc. v Lepage Bakeries, Inc.*, 16 AD3d 146; *Chubb & Son v Consoli*, 283 AD2d 297; *Bertran Packing v Transworld Fabricators*, 50 AD2d 542; *Ash v Georgia-Pacific Corp.*, 957 F2d 432; *Board of Educ. of Hudson City School Dist. v Sargent, Webster, Crenshaw & Folley*, 146 AD2d 190, 75 NY2d 702; *Smith v John Hancock Mut. Life Ins. Co.*, 260 App Div 990; *Eastern Trading Co. v Refco, Inc.*, 229 F3d 617; *Henry v Allen*, 151 NY 1.) II. The motive with which an agent acts determines whether the agent acts adversely to the principal for purposes of imputing the agent's knowledge to the principal. (*Center v Hampton Affiliates*, 66 NY2d 782; *Capital Wireless Corp. v Deloitte & Touche*, 216 AD2d 663; *In re CBI Holding Co., Inc.*, 529 F3d 432; *Chemical Bank v Affiliated FM Ins. Co.*, 196 F3d 373; *Ash v Georgia-Pacific Corp.*, 957 F2d 432.)

*Paduano & Weintraub LLP*, New York City (*Leonard Weintraub* and *Kathryn L. Bedke* of counsel), for Anthony Paduano,

amicus curiae in the first above-entitled action. I. Third parties who assist corporate insiders in harming a corporation should be required to affirmatively prove imputation under in pari delicto. (*Federal Deposit Ins. Corp. v O'Melveny & Myers,* 61 F3d 17; *Bateman Eichler, Hill Richards, Inc. v Berner,* 472 US 299; *Pittsburg Carbon Co. [Ltd.] v McMillin,* 119 NY 46; *Irwin v Curie,* 171 NY 409; *Furlong v Johnston,* 209 App Div 198, 239 NY 141.) II. The adverse interest exception is satisfied by a showing that insiders intended to benefit themselves by their misconduct. (*Center v Hampton Affiliates,* 66 NY2d 782; *Capital Wireless Corp. v Deloitte & Touche,* 216 AD2d 663; *Marine Midland Bank v Russo Produce Co.,* 50 NY2d 31; *In re CBI Holding Co., Inc.,* 529 F3d 432; *In re Phar-Mor, Inc. Sec. Litig.,* 900 F Supp 784; *In re Crazy Eddie Sec. Litig.,* 802 F Supp 804.) III. There should be no imputation when there are innocent insiders who could have stopped the wrongdoing. (*Symbol Tech., Inc. v Deloitte & Touche, LLP,* 69 AD3d 191.) IV. Public policy dictates that a receiver or trustee trying to recover monies for innocent investors and creditors should be allowed to sue malfeasant third parties, such as attorneys and accountants who assist corporate misconduct. (*Smith v John Hancock Mut. Life Ins. Co.,* 260 App Div 990; *Scholes v Lehmann,* 56 F3d 750, *cert denied sub nom. African Enter., Inc. v Scholes,* 516 US 1028; *In re Leasing Consultants, Inc.,* 592 F2d 103; *Federal Deposit Ins. Corp. v O'Melveny & Myers,* 61 F3d 17.)

*Goldberg Segalla LLP,* Albany (*Matthew S. Lerner* of counsel), for DRI—The Voice of the Defense Bar, amicus curiae in the first above-entitled action. I. Courts should continue to interpret the adverse interest exception narrowly pursuant to this Court's well-settled agency jurisprudence. (*Center v Hampton Affiliates,* 66 NY2d 782; *Farr v Newman,* 14 NY2d 183; *Henry v Allen,* 151 NY 1; *Marine Midland Bank v Russo Produce Co.,* 50 NY2d 31; *546-552 W. 146th St. LLC v Arfa,* 54 AD3d 543, 12 NY3d 840; *Bullmore v Ernst & Young Cayman Is.,* 20 Misc 3d 667; *People v Damiano,* 87 NY2d 477.) II. The trustee's proposed rule would have a dramatic and negative impact on lawyers and the relationship between lawyer and client. (*Maxwell v KPMG LLP,* 520 F3d 713; *Stoneridge Investment Partners, LLC v Scientific-Atlanta, Inc.,* 552 US 148; *Central Bank of Denver, N. A. v First Interstate Bank of Denver, N. A.,* 511 US 164; *Center v Hampton Affiliates,* 66 NY2d 782.) III. This Court should not transform lawyers and law firms into public gatekeepers.

*Strook & Strook & Lavan LLP,* New York City (*James L. Ber-*

nard, Elizabeth H. Cronise, David M. Cheifetz and Hannah Yu of counsel), for M. Todd Henderson, amicus curiae in the first above-entitled action. This case involves the application of long-standing basic principles of New York corporate law which should not be modified by creating novel exceptions. (Bateman Eichler, Hill Richards, Inc. v Berner, 472 US 299; Buechner v Avery, 38 AD3d 443; Bullmore v Ernst & Young Cayman Is., 20 Misc 3d 667; McConnell v Commonwealth Pictures Corp., 7 NY2d 465; Popielawski v Gimbel, 235 App Div 198; Ford v Henry, 155 Misc 2d 192; Donovan v Rothman, 302 AD2d 238; Henry v Allen, 151 NY 1; Sturgis v Boyer, 24 How [65 US] 110; Philadelphia & Reading R. Co. v Derby, 14 How [55 US] 468.)

Skadden Arps Slate Meagher & Flom LLP, New York City (Scott D. Musoff and Christos Ravanides of counsel), Ira D. Hammerman, Washington, D.C., and Kevin Carroll for Securities Industry and Financial Markets Association, amicus curiae in the first above-entitled action. I. Securities firms already face massive liability risk, apart from actions brought on behalf of principal wrongdoers. II. The in pari delicto defense disables a primary corporate wrongdoer, or a trustee succeeding to that wrongdoer's claims, from recovering from equally or less culpable third parties. (Stone v Freeman, 298 NY 268; Riggs v Palmer, 115 NY 506; Saratoga County Bank v King, 44 NY 87; Stecher v 85th Estates Co., 43 AD3d 732; Ernst v Crosby, 140 NY 364; Diversified Group v Sahn, 259 AD2d 47.) III. The narrow exception that applies when an insider "totally abandons" the corporation's interests does not apply when the insider's conduct confers substantial benefits on the corporation. (Center v Hampton Affiliates, 66 NY2d 782; Central Bank of Denver, N. A. v First Interstate Bank of Denver, N. A., 511 US 164.) IV. The in pari delicto defense does not depend on psychoanalyzing the insider's subjective motivation. (Virginia Bankshares, Inc. v Sandberg, 501 US 1083; Central Bank of Denver, N. A. v First Interstate Bank of Denver, N. A., 511 US 164; Stedman v Storer, 308 F Supp 881; Biesenbach v Guenther, 588 F2d 400.) V. The creditors have their own direct causes of action and should not recover by standing in the shoes of the principal corporate wrongdoer. (Caplin v Marine Midland Grace Trust Co., 406 US 416.) VI. A broad application of the in pari delicto defense will not encourage misconduct. VII. The Court should not address issues well outside the scope of the certification request.

Pachulski Stang Ziehl & Jones LLP, New York City (Dean A. Ziehl, Harry D. Hochman and Maria A. Bove of counsel), for

National Association of Bankruptcy Trustees, amicus curiae in the first above-entitled action. I. As a matter of public policy, bankruptcy trustees should be permitted to prosecute claims against a corporation's gatekeepers. (*United States v Arthur Young & Co.,* 465 US 805.) II. A trustee is the appropriate party to assert claims against complicit gatekeepers. (*Chartschlaa v Nationwide Mut. Ins. Co.,* 538 F3d 116; *Hirsch v Arthur Andersen & Co.,* 72 F3d 1085; *Vincel v White Motor Corp.,* 521 F2d 1113; *St. Paul Fire & Mar. Ins. Co. v PepsiCo, Inc.,* 884 F2d 688; *Credit Alliance Corp. v Arthur Andersen & Co.,* 65 NY2d 536; *State of Cal. Pub. Employees' Retirement Sys. v Shearman & Sterling,* 95 NY2d 427.) III. The de facto immunity rule of *Shearson Lehman Hutton, Inc. v Wagoner* (944 F2d 114 [1991]) is not the law of New York State. (*In re Peaslee,* 547 F3d 177; *Rivkin v Century 21 Teran Realty LLC,* 10 NY3d 344; *Sokoloff v Harriman Estates Dev. Corp.,* 96 NY2d 409; *Guardian Life Ins. Co. of Am. v Chemical Bank,* 94 NY2d 418; *Symbol Tech., Inc. v Deloitte & Touche, LLP,* 69 AD3d 191; *Capital Wireless Corp. v Deloitte & Touche,* 216 AD2d 663; *Buechner v Avery,* 38 AD3d 443; *Barnes v Hirsch,* 215 App Div 10, *affd sub nom. Barnes v Schatzkin,* 242 NY 555, 273 US 709; *Caplin v Marine Midland Grace Trust Co.,* 406 US 416.) IV. No law requires and no public policy supports affording complicit gatekeepers an in pari delicto defense against a trustee. (*O'Melveny & Myers v FDIC,* 512 US 79; *Talmage v Pell,* 7 NY 328; *Schacht v Brown,* 711 F2d 1343; *Scholes v Lehmann,* 56 F3d 750; *National Sur. Corp. v Lybrand,* 256 App Div 226.) V. The Court should rule that imputation/in pari delicto is not available to those who do not deal "materially in good faith" with the company or who knowingly participate or acquiesce in misconduct. VI. The Court should reject defendants' artificially narrow interpretation of the adverse interest exception. (*In re CBI Holding Co., Inc.,* 529 F3d 432; *Doran v Salem Inn, Inc.,* 422 US 922; *Pershing Park Villas Homeowners Assn. v United Pac. Ins. Co.,* 219 F3d 895.)

Grant & Eisenhofer P.A., New York City (*Stuart M. Grant* of counsel), *Megan D. McIntyre,* Wilmington, Delaware, *John C. Kairis, Christine M. Mackintosh* and *Wolf Haldenstein Adler Freeman & Herz LLP,* New York City (*Daniel W. Krasner, Eric B. Levine, Peter C. Harrar, Alan A.B. McDowell* and *Kate M. McGuire* of counsel), for appellants in the second above-entitled action. I. As a matter of substantive tort law, wholly apart from the question of agency, in pari delicto does not bar this action. (*Tracy v Talmage,* 14 NY 162; *Bateman Eichler, Hill Richards, Inc. v Berner,* 472 US 299; *Pinter v Dahl,* 486 US 622; *City of*

*New York v Keene Corp.,* 304 AD2d 119; *In re Parmalat Sec. Litig.,* 659 F Supp 2d 504; *Manion v Pan Am. World Airways,* 55 NY2d 398; *Andrews v Empire City Racing Assn.,* 170 Misc 338; *Quintal v Fidelity & Deposit Co.,* 142 Misc 657; *Baldwin v Lev,* 163 Misc 929; *Irwin v Curie,* 171 NY 409.) II. Even if in pari delicto has any relevance here, American International Group, Inc. should not be deemed culpable because of the acts of its corrupt officers. (*Center v Hampton Affiliates,* 66 NY2d 782; *Defer LP v Raymond James Fin., Inc.,* 654 F Supp 2d 204; *Seward Park Hous. Corp. v Cohen,* 287 AD2d 157; *Smalls v Reliable Auto Serv.,* 205 AD2d 523; *Araya v Viacom Outdoor Inc.,* 22 Misc 3d 1131[A], 2009 NY Slip Op 50384[U]; *Smith v John Hancock Mut. Life Ins. Co.,* 260 App Div 990; *Mutual Life Ins. Co. of N. Y. v Hilton-Green,* 241 US 613; *McCormack v Security Mut. Life Ins. Co.,* 220 NY 447; *Fireman's Fund Ins. Cos. v Meenan Oil Co.,* 755 F Supp 547; *Thabault v Chait,* 541 F3d 512.) III. Public policy and the gatekeeping role of auditors of public corporations militate against invocation of the in pari delicto doctrine here. (*Tannebaum v Provident Mut. Life Ins. Co. of Phila.,* 41 NY2d 1087; *In re Leasing Consultants, Inc.,* 592 F2d 103; *Furlong v Johnston,* 209 App Div 198; *United States v Arthur Young & Co.,* 465 US 805; *United States v Benjamin,* 328 F2d 854; *Scholes v Lehmann,* 56 F3d 750; *In re Personal & Bus. Ins. Agency,* 334 F3d 239; *Morgado Family Partners, LP v Lipper,* 19 AD3d 262; *Federal Deposit Ins. Corp. v O'Melveny & Myers,* 61 F3d 17; *Matter of Comverse Tech., Inc. Derivative Litig.,* 56 AD3d 49.)

*King & Spalding LLP* (*Paul D. Clement,* of the District of Columbia bar, admitted pro hac vice, of counsel), *Cravath, Swaine & Moore LLP,* New York City (*Thomas G. Rafferty, Antony L. Ryan* and *Samira Shah* of counsel), and *Connolly Bove Lodge & Hutz LLP,* Wilmington, Delaware (*Henry E. Gallagher, Jr.,* of counsel), for respondent in the second above-entitled action. I. The in pari delicto doctrine bars claims brought by or on behalf of a corporation based on the corporation's own fraud. (*Thomas v Richmond,* 12 Wall [79 US] 349; *Bateman Eichler, Hill Richards, Inc. v Berner,* 472 US 299; *Peck v Burr,* 10 NY 294; *Haynes v Rudd,* 102 NY 372; *Union Exch. Natl. Bank of N.Y. v Joseph,* 231 NY 250; *Trainor v John Hancock Mut. Life Ins. Co.,* 54 NY2d 213; *Buechner v Avery,* 38 AD3d 443; *Sabia v Mattituck Inlet Mar. & Shipyard, Inc.,* 24 AD3d 178; *390 W. End Ave. Assoc. v Youngstein,* 221 AD2d 292; *Capital Wireless Corp. v Deloitte & Touche,* 216 AD2d 663.) II. New York law requires imputation of an agent's fraud to his principal. (*Matter of Stan-*

*dard Fruit & S. S. Co. v Waterfront Commn. of N.Y. Harbor,* 43 NY2d 11; *Oliner v Mid-Town Promoters,* 2 NY2d 63; *Prudential-Bache Sec. v Citibank,* 73 NY2d 263; *Ingalls v Morgan,* 10 NY 178; *Center v Hampton Affiliates,* 66 NY2d 782; *Henry v Allen,* 151 NY 1; *Fishkill Sav. Inst. v National Bank of Fishkill,* 80 NY 162; *Cragie v Hadley,* 99 NY 131; *Griswold v Haven,* 25 NY 595; *Clark v Hyatt,* 118 NY 563.) III. There is no public policy justification for creating a special exception to the in pari delicto doctrine and the rule of imputation. (*Saratoga County Bank v King,* 44 NY 87; *Tannebaum v Provident Mut. Life Ins. Co. of Phila.,* 41 NY2d 1087; *Trainor v John Hancock Mut. Life Ins. Co.,* 54 NY2d 213; *Bateman Eichler, Hill Richards, Inc. v Berner,* 472 US 299; *In re Leasing Consultants, Inc.,* 592 F2d 103; *Furlong v Johnston,* 209 App Div 198; *Tracy v Talmage,* 14 NY 162; *Ross v Bernhard,* 396 US 531; *Koster v [American] Lumbermens Mut. Casualty Co.,* 330 US 518; *Potter v Walker,* 276 NY 15.)

*Willkie Farr & Gallagher LLP,* New York City (*Kelly M. Hnatt* and *Derek M. Schoenmann* of counsel), *Richard I. Miller, General Counsel, American Institute of Certified Public Accountants,* and *Bradley M. Pryba* for American Institute of Certified Public Accountants and another, amici curiae in the first and second above-entitled actions. I. The in pari delicto defense should remain available to auditors who are alleged to have acted wrongfully. (*Bullmore v Ernst & Young Cayman Is.,* 20 Misc 3d 667; *Bateman Eichler, Hill Richards, Inc. v Berner,* 472 US 299; *Prudential-Bache Sec. v Citibank,* 73 NY2d 263; *Shearson Lehman Hutton, Inc. v Wagoner,* 944 F2d 114; *Center v Hampton Affiliates,* 66 NY2d 782; *Symbol Tech., Inc. v Deloitte & Touche, LLP,* 69 AD3d 191; *546-552 W. 146th St. LLC v Arfa,* 54 AD3d 543; *Capital Wireless Corp. v Deloitte & Touche,* 216 AD2d 663; *Baena v KPMG LLP,* 453 F3d 1; *Cenco Inc. v Seidman & Seidman,* 686 F2d 449.) II. The questions before the Court have serious policy implications for the profession. (*Baena v KPMG LLP,* 453 F3d 1; *In re Worlds of Wonder Sec. Litig.,* 35 F3d 1407; *Maxwell v KPMG LLP,* 520 F3d 713.)

*Gibson, Dunn & Crutcher LLP,* Washington, D.C. (*Douglas R. Cox, Michael J. Scanlon, Jason J. Mendro* and *Dace A. Caldwell* of counsel), for Center for Audit Quality, amicus curiae in the first and second above-entitled actions. I. Under settled law, a company may not sue its auditor for claims arising from the company's wrongdoing. (*Bullmore v Ernst & Young Cayman Is.,* 20 Misc 3d 667; *Shearson Lehman Hutton, Inc. v Wagoner,* 944

F2d 114; *Buechner v Avery,* 38 AD3d 443; *Maxwell v KPMG LLP,* 520 F3d 713; *Barker v Kallash,* 63 NY2d 19; *Riggs v Palmer,* 115 NY 506; *Alami v Volkswagen of Am.,* 97 NY2d 281; *Peltz v SHB Commodities, Inc.,* 115 F3d 1082; *Bateman Eichler, Hill Richards, Inc. v Berner,* 472 US 299; *In re Dublin Sec., Inc.,* 133 F3d 377.) II. Appellants' efforts to craft novel exceptions to imputation are unsupported by law and contrary to the public interest. (*McConnell v Commonwealth Pictures Corp.,* 7 NY2d 465; *Matter of Herle,* 165 Misc 46; *People v Taylor,* 9 NY3d 129; *Payne v Tennessee,* 501 US 808; *Matter of Higby v Mahoney,* 48 NY2d 15; *Barker v Kallash,* 63 NY2d 19; *Cenco Inc. v Seidman & Seidman,* 686 F2d 449; *Credit Alliance Corp. v Arthur Andersen & Co.,* 65 NY2d 536; *DiLeo v Ernst & Young,* 901 F2d 624; *In re Worlds of Wonder Sec. Litig.,* 35 F3d 1407.)

### OPINION OF THE COURT

READ, J.

In these two appeals, plaintiffs ask us, in effect, to reinterpret New York law so as to broaden the remedies available to creditors or shareholders of a corporation whose management engaged in financial fraud that was allegedly either assisted or not detected at all or soon enough by the corporation's outside professional advisers, such as auditors, investment bankers, financial advisers and lawyers. For the reasons that follow, we decline to alter our precedent relating to in pari delicto, and imputation and the adverse interest exception, as we would have to do to bring about the expansion of third-party liability sought by plaintiffs here.

### I.

*Kirschner*

This lawsuit was triggered by the collapse of Refco, once a leading provider of brokerage and clearing services in the derivatives, currency and futures markets. After a leveraged buyout in August 2004, Refco became a public company in August 2005 by way of an initial public offering.[1] In October 2005, Refco disclosed that its president and chief executive officer had orchestrated a succession of loans, apparently beginning as far

---

1. As used in this opinion, the term "Refco," unless specified otherwise, does not distinguish between Refco, Inc., the publicly traded company formed by the IPO, and Refco Group Ltd., LLC, the entity through which Refco, Inc.'s business was primarily conducted prior to the IPO, or Refco Group Ltd.'s direct and indirect subsidiaries, such as Refco Capital Markets, Ltd. (RCM).

back as 1998, which hid hundreds of millions of dollars of the company's uncollectible debt from the public and regulators. These maneuvers created a falsely positive picture of Refco's financial condition.[2] In short order, this revelation caused Refco's stock to plummet and RCM, Refco's brokerage arm, to experience a "run" on customer accounts, forcing Refco to file for bankruptcy protection.

In December 2006, the United States Bankruptcy Court for the Southern District of New York confirmed Refco's chapter 11 bankruptcy plan, which became effective soon thereafter. Under the plan, secured lenders, who were owed $717 million, were paid in full; Refco's bondholders and the securities customers and unsecured creditors of RCM were due to receive 83.4 cents, 85.6 cents and 37.6 cents on the dollar, respectively; and Refco's general creditors with unsecured claims could expect from 23 cents to 37.6 cents on the dollar (*see One Chapter of Refco Saga Closed*, 47 Bankr Ct Decisions Wkly News & Comment [No. 13], Jan. 16, 2007, at 2; *Refco Exits Bankruptcy Protection*, New York Times, Dec. 27, 2006, section C, at 3).

The plan also established a Litigation Trust, which authorized plaintiff Marc S. Kirschner, as Litigation Trustee, to pursue claims and causes of action possessed by Refco prior to its bankruptcy filing. The Litigation Trust's beneficiaries are the holders of allowed general unsecured claims against Refco. Any recoveries are to be allocated, after repayment of up to $25 million drawn from certain Refco assets to administer the Trust, on the basis of the beneficiaries' allowed claims under the confirmed plan.

In August 2007, the Litigation Trustee filed a complaint in Illinois state court asserting fraud, breach of fiduciary duty and malpractice against Refco's president and CEO and other owners and senior managers (collectively, the Refco insiders); investment banks that served as underwriters for the LBO and/or the

---

**2.** Refco's fraudulent financial schemes are explained in several of numerous opinions issued by the United States District Court for the Southern District of New York, which has handled the flood of civil litigation in the aftermath of Refco's bankruptcy (*see In re Refco, Inc. Sec. Litig.*, 503 F Supp 2d 611, 618-620 [SD NY 2007] [describing the so-called round-trip loans that concealed Refco's uncollectible receivables]; *Thomas H. Lee Equity Fund V, L.P. v Grant Thornton LLP*, 586 F Supp 2d 119, 122-123 [SD NY 2008] [same]; *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, 2007 WL 2694469, *4, 2007 US Dist LEXIS 68082, *12-15 [SD NY 2007] [describing how RCM allegedly diverted customer assets and improperly used the proceeds to make loans and fund the business operations of other Refco affiliates]).

IPO; Refco's law firm; accounting firms that had provided services to Refco; and several customers that participated in the allegedly deceptive loans. According to the Trustee, these defendants all aided and abetted the Refco insiders in carrying out the fraud, or were negligent in neglecting to discover it. A year later, the Litigation Trustee filed a complaint in Massachusetts state court, asserting similar claims against the accounting firm KPMG LLP. Both lawsuits were removed to federal court and transferred to the Southern District of New York for coordinated or consolidated proceedings.

Defendants subsequently moved to dismiss the Litigation Trustee's claims pursuant to rule 12 (b) (1) and (6) of the Federal Rules of Civil Procedure, and the District Court granted the motions on April 14, 2009. Because the Trustee acknowledged that the Refco insiders masterminded Refco's fraud, the judge identified as the threshold issue whether the claims were subject to dismissal by virtue of the Second Circuit's *Wagoner* rule (*see Shearson Lehman Hutton, Inc. v Wagoner*, 944 F2d 114, 118 [2d Cir 1991] [bankruptcy trustee does not possess standing to seek recovery from third parties alleged to have joined with the debtor corporation in defrauding creditors]).[3] Further, since "[a]ll parties agree[d] that if the *Wagoner* rule applie[d], the Litigation Trustee lack[ed] standing to assert any of Refco's claims against the defendants," the judge observed that "the parties' dispute focus[ed] solely on whether the narrow exception to the *Wagoner* rule—the 'adverse-interest' exception—applie[d]" (*Kirschner v Grant Thornton LLP*, 2009 WL 1286326, *5, 2009 US Dist LEXIS 32581, *19-20 [2009]).

Citing Second Circuit cases handed down after our decision in *Center v Hampton Affiliates* (66 NY2d 782 [1985]), the District Court noted that, in order for the adverse interest exception to

---

3. Although the District Court broadly characterized the *Wagoner* rule as "an application of the substantive law of New York" (*Kirschner v Grant Thornton LLP*, 2009 WL 1286326, *1 n 4, 2009 US Dist LEXIS 32581, *3 n 4 [SD NY 2009]; *Kirschner v KPMG LLP*, 2009 WL 1010060, *1 n 2, 2009 US Dist LEXIS 32539, *2 n 2 [SD NY 2009]), this rule derives in significant part from federal bankruptcy law, and is a prudential limitation on standing under federal law (*see Baena v KPMG LLP*, 453 F3d 1, 5 [1st Cir 2006]). Thus, the *Wagoner* rule is not part of New York law except as it reflects the in pari delicto principle, and in New York, in pari delicto is an affirmative defense, not a matter of standing. Even so—and although the Litigation Trustee may be understood to imply otherwise—in pari delicto may be resolved on the pleadings in a state court action in an appropriate case (*see e.g. Donovan v Rothman*, 302 AD2d 238, 239 [1st Dept 2003] [affirming dismissal of contract claim on ground of in pari delicto]).

apply, "the [corporate officer] must have totally abandoned [the corporation's] interests and be acting entirely for his own or another's purposes . . . because where an officer acts entirely in his own interests and adversely to the interests of the corporation, that misconduct cannot be imputed to the corporation" (2009 WL 1286326, *5, 2009 US Dist LEXIS 32581, *20 [citations and internal quotation marks omitted]). Further, "[i]n determining whether an agent's actions were indeed adverse to the corporation, courts have identified '[t]he relevant issue [as being the] short term benefit or detriment to the corporation, not any detriment to the corporation resulting from the unmasking of the fraud' " (2009 WL 1286326, *6, 2009 US Dist LEXIS 32581, *21, quoting *In re Wedtech Corp.*, 81 BR 240, 242 [SD NY 1987]).

The District Court concluded that "[t]his line of precedent foreclose[d] the Trustee's claims" because the complaint was "saturated by allegations that Refco received substantial benefits from the [Refco] insiders' alleged wrongdoing" (2009 WL 1286326, *6, 2009 US Dist LEXIS 32581, *22). Thus, under the Trustee's own allegations the Refco insiders stole *for* Refco, not *from* it—i.e., "the burden of the [Refco] insiders' fraud was not borne by Refco or its then-current shareholders who were themselves the [Refco] insiders—but rather by outside parties, including Refco's customers, creditors, and third parties who acquired shares through the IPO" (2009 WL 1286326, *6, 2009 US Dist LEXIS 32581, *24).

In reaching his decision, the judge rejected as "without merit" the Litigation Trustee's "industrious" interpretation of the Second Circuit's decision in *In re CBI Holding Co., Inc.* (529 F3d 432 [2d Cir 2008]), a case where the court held that a bankruptcy court's finding that the adverse interest exception applied was not clearly erroneous. The judge declined to read a solely "intent-based" standard into *CBI* because

> "deferring to a finder-of-fact's choice as to which evidence to credit after a trial, or acknowledging that facts related to intent could contribute to the explication of how a fraud worked and to whose benefit it accrued, does not make the participants' intent the 'touchstone' of the analysis such that it precludes dismissal on the pleadings" (2009 WL 1286326, *7, 2009 US Dist LEXIS 32581, *26).

"To hold otherwise," he reasoned, "would be to explode the

adverse-interest exception, transforming it from a 'narrow' exception . . . into a new, and nearly impermeable rule barring imputation" (2009 WL 1286326, *7 n 14, 2009 US Dist LEXIS 32581, *27 n 14). The standard could not depend exclusively on the Refco insiders' subjective motivation, the judge explained, because "[w]henever insiders conduct a corporate fraud they are doing so, at least in part, to promote their own advantage" (2009 WL 1286326, *7 n 14, 2009 US Dist LEXIS 32581, *28 n 14).

Having declined the Litigation Trustee's invitation to read *CBI* to inquire solely into insiders' claimed motivations, without regard to the nature and effect of their misconduct, the District Court revisited the fraud's impact on Refco. He again emphasized that the Trustee's allegations did not establish injury to Refco, because the Refco insiders did not embezzle or steal assets from Refco, but instead sold their holdings in Refco to third parties at fraudulently inflated prices—i.e., the Refco insiders' benefit came at the expense of the new purchasers of Refco securities, not Refco itself. Critically, "the Trustee must allege, not that the [Refco] insiders intended to, or to some extent did, benefit from their scheme, but that the corporation was *harmed* by the scheme, rather than being one of its beneficiaries" (2009 WL 1286326, *7, 2009 US Dist LEXIS 32581, *27).

Plaintiff appealed to the Second Circuit Court of Appeals. After presenting a comprehensive account of the Litigation Trustee's factual allegations and the District Court's decision, the court remarked that the parties seemingly did not dispute several propositions in the lower court's decision, which "appear[ed] to correctly reflect New York law concerning the adverse interest exception" (*Kirschner v KPMG LLP*, 590 F3d 186, 191 [2d Cir 2009]); specifically, that the adverse interest exception was "a narrow one and that the guilty manager must have totally abandoned his corporation's interests for [the exception] to apply"; and that "whether the agent's actions were adverse to the corporation turns on the short term benefit or detriment to the corporation, not any detriment to the corporation resulting from the unmasking of the fraud" (*id.* [internal quotation marks omitted] [quoting the District Court's opinion]). Nonetheless, the court observed, "[a]s [the District Court judge] applied these propositions to the Trustee's allegations, . . . he interpreted New York law in ways that [brought] the parties into sharp dispute concerning certain aspects of the adverse interest exception"; namely, "the state of mind of the [Refco] insiders and the harm to their corporation" (*id.*).

The Second Circuit noted that "New York cases seem[ed] to support" the District Court's conclusion that an insider's subjective intent was not the "touchstone" of adverse interest analysis; however, the court added, "other New York cases may be read to make intent more significant" (*id.* at 191-192 n 3). In light of the parties' "differing uses of New York cases, coupled with the somewhat divergent language used by the District Court in the pending case and by [the Second Circuit] in *CBI*, both endeavoring to interpret New York law," the court sought our guidance as to the scope of New York's adverse interest exception (*id.* at 194). Accordingly, on December 23, 2009 the Second Circuit certified eight questions, inviting us to "focus [our] attention on questions (2) and (3)" (*id.* at 195), which are "whether the adverse interest exception is satisfied by showing that the insiders intended to benefit themselves by their misconduct"; and "whether the exception is available only where the insiders' misconduct has harmed the corporation," respectively (*id.* at 194-195).

## Teachers' Retirement System of Louisiana and City of New Orleans Employees' Retirement System

This lawsuit is a derivative action brought on behalf of American International Group, Inc. (AIG) by the Teachers' Retirement System of Louisiana and the City of New Orleans Employees' Retirement System (derivative plaintiffs). According to the complaint, senior officers of AIG set up a fraudulent scheme to misstate AIG's financial performance in order to deceive investors into believing that the company was more prosperous and secure than it really was. The complaint further accuses these officers of causing the corporation to avoid taxes by falsely claiming that workers' compensation policies were other types of insurance, and of engaging in "covered calls" to recognize investment gains without paying capital gains taxes. It is also claimed that AIG conspired with other companies to rig markets to subvert supposedly competitive auctions, and that the senior officers exploited their familiarity with improper financial machinations by selling the company's "expertise" in balance sheet manipulation. Specifically, AIG is alleged to have sold to other companies insurance policies that did not involve the actual transfer of insurable risk, with the improper purpose of helping those companies report better financial results; and to have created special purpose entities for other companies without observing the required accounting rules for the similarly improper purpose of helping those companies hide

impaired assets. These financial tricks eventually came to light, resulting in serious harm to AIG. Stockholder equity was reduced by $3.5 billion, and AIG was saddled with litigation and regulatory proceedings requiring it to pay over $1.6 billion in fines and other costs.

Derivative plaintiffs do not allege that defendant Pricewater-houseCoopers LLP (PwC) conspired with AIG or its agents to commit accounting fraud. Rather, they contend that, as AIG's independent auditor, PwC did not perform its auditing responsibilities in accordance with professional standards of conduct, and so failed to detect or report the fraud perpetrated by AIG's senior officers. Had it done so, derivative plaintiffs argue, the fraudulent accounting schemes at AIG would have been timely discovered and rectified.

PwC moved to dismiss the action. On February 10, 2009, the Delaware Court of Chancery granted the motion, concluding that New York law applied to the claims and that, under New York law, the claims were barred (*In re American Intl. Group, Inc.*, 965 A2d 763 [Del Ch 2009]). Consistent with the way in which the District Court handled the same issues two months later in *Kirschner*, the vice-chancellor decided that, under New York's law of agency, the wrongdoing of AIG's senior officers was imputed to AIG and that, based on the allegations in the complaint, AIG's senior officers did not totally abandon AIG's interests such that the adverse interest exception to imputation would apply. Once the wrongdoing was imputed to AIG, the Court of Chancery decided that AIG's claims against PwC were barred by New York's in pari delicto doctrine and the *Wagoner* rule governing standing.

Derivative plaintiffs appealed. Determining that the appeal's resolution depended on significant and unsettled questions of New York law, on March 3, 2010, the Delaware Supreme Court issued a decision certifying the following question to us:

> "Would the doctrine of *in pari delicto* bar a derivative claim under New York law where a corporation sues its outside auditor for professional malpractice or negligence based on the auditor's failure to detect fraud committed by the corporation; and, the outside auditor did not knowingly participate in the corporation's fraud, but instead, failed to satisfy professional standards in its audits of the corporation's financial statements?" (*Teachers' Retirement*

*Sys. of La. v PricewaterhouseCoopers LLP*, 998 A2d 280, 282-283 [Del 2010].)

## II.

In Pari Delicto

The doctrine of in pari delicto[4] mandates that the courts will not intercede to resolve a dispute between two wrongdoers. This principle has been wrought in the inmost texture of our common law for at least two centuries (*see e.g. Woodworth v Janes*, 2 Johns Cas 417, 423 [NY 1800] [parties in equal fault have no rights in equity]; *Sebring v Rathbun*, 1 Johns Cas 331, 332 [NY 1800] [where both parties are equally culpable, courts will not "interpose in favour of either"]). The doctrine survives because it serves important public policy purposes. First, denying judicial relief to an admitted wrongdoer deters illegality. Second, in pari delicto avoids entangling courts in disputes between wrongdoers. As Judge Desmond so eloquently put it more than 60 years ago,

> "[N]o court should be required to serve as paymaster
> of the wages of crime, or referee between thieves.
> Therefore, the law will not extend its aid to either
> of the parties or listen to their complaints against
> each other, but will leave them where their own acts
> have placed them" (*Stone v Freeman*, 298 NY 268,
> 271 [1948] [internal quotation marks omitted]).

The justice of the in pari delicto rule is most obvious where a willful wrongdoer is suing someone who is alleged to be merely negligent. A criminal who is injured committing a crime cannot sue the police officer or security guard who failed to stop him; the arsonist who is singed cannot sue the fire department. But, as the cases we have cited show, the principle also applies where both parties acted willfully. Indeed, the principle that a wrongdoer should not profit from his own misconduct is so strong in New York that we have said the defense applies even in difficult cases and should not be "weakened by exceptions" (*McConnell v Commonwealth Pictures Corp.*, 7 NY2d 465, 470 [1960] ["We are not working here with narrow questions of technical law. We are applying fundamental concepts of morality and fair dealing *not to be weakened by exceptions*" (emphasis added)]; *see also Saratoga County Bank v King*, 44 NY 87, 94 [1870] [characterizing the doctrine as "inflexible"]).

---

4. The doctrine's full name is in pari delicto potior est conditio defendentis, meaning "[i]n a case of equal or mutual fault, the position of the [defending party] is the better one" (*Baena*, 453 F3d at 6 n 5 [internal quotation marks omitted]).

Imputation

■ Traditional agency principles play an important role in an in pari delicto analysis. Of particular importance is a fundamental principle that has informed the law of agency and corporations for centuries; namely, the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals (*see Henry v Allen*, 151 NY 1, 9 [1896] [imputation is "general rule"]; *see also Cragie v Hadley*, 99 NY 131 [1885]; *accord Center*, 66 NY2d at 784). Corporations are not natural persons. "[O]f necessity, [they] must act solely through the instrumentality of their officers or other duly authorized agents" (*Lee v Pittsburgh Coal & Min. Co.*, 56 How Prac 373, 375 [Super Ct 1877], *affd* 75 NY 601 [1878]). A corporation must, therefore, be responsible for the acts of its authorized agents even if particular acts were unauthorized (*see Ruggles v American Cent. Ins. Co. of St. Louis*, 114 NY 415, 421 [1889]). "The risk of loss from the unauthorized acts of a dishonest agent falls on the principal that selected the agent" (*see Andre Romanelli, Inc. v Citibank, N.A.*, 60 AD3d 428, 429 [1st Dept 2009]). After all, the principal is generally better suited than a third party to control the agent's conduct, which at least in part explains why the common law has traditionally placed the risk on the principal.

Agency law presumes imputation even where the agent acts less than admirably, exhibits poor business judgment, or commits fraud (*see e.g. Price v Keyes*, 62 NY 378, 384-385 [1875] [critical issue is whether agent was acting in furtherance of his duties, regardless of his "selfish motive"]). As we explained long ago, a corporation "is represented by its officers and agents, and their fraud in the course of the corporate dealings[ ] is in law the fraud of the corporation" (*Cragie*, 99 NY at 134; *accord Reynolds v Snow*, 10 AD2d 101, 109 [1st Dept 1960], *affd* 8 NY2d 899 [1960]). Like a natural person, a corporation must bear the consequences when it commits fraud (*see e.g. Wight v BankAmerica Corp.*, 219 F3d 79, 86-87 [2d Cir 2000] [under "fundamental principle(s) of agency," managers' misconduct within the scope of their employment is imputed and "bars a trustee from suing to recover for a wrong that he himself essentially took part in"]).

When corporate officers carry out the everyday activities central to any company's operation and well-being—such as issuing financial statements, accessing capital markets, handling customer accounts, moving assets between corporate entities,

and entering into contracts—their conduct falls within the scope of their corporate authority (*see e.g. Baena*, 453 F3d at 7 ["The approval and oversight of (financial) statements is an ordinary function of management that is done on the company's behalf, which is typically enough to attribute management's actions to the company itself"]). And where conduct falls within the scope of the agents' authority, everything they know or do is imputed to their principals.

Next, the presumption that agents communicate information to their principals does not depend on a case-by-case assessment of whether this is likely to happen. Instead, it is a legal presumption that governs in every case, except where the corporation is actually the agent's intended victim (*see Center*, 66 NY2d at 784 ["when an agent is engaged in a scheme to defraud his principal . . . he cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose"]). Where the agent is defrauding someone else on the corporation's behalf, the presumption of full communication remains in full force and effect (*see* 3 Thompson and Thompson, Commentaries on the Law of Corporations § 1778, at 347 [3d ed 1927] ["However applicable the dictum that an agent about to commit a fraud will not announce his intention may be in the case of fraud by an agent upon his own principal, it has no application when the agent, acting in behalf of his principal, or ostensibly so, commits a fraud upon a third person"]).

In sum, we have held for over a century that all corporate acts—including fraudulent ones—are subject to the presumption of imputation (*Cragie*, 99 NY at 134). And, as with in pari delicto, there are strong considerations of public policy underlying this precedent: imputation fosters an incentive for a principal to select honest agents and delegate duties with care.

Adverse Interest Exception to Imputation

█ We articulated the adverse interest exception in *Center* as follows: "To come within the exception, the agent must have *totally abandoned* his principal's interests and be acting *entirely* for his own or another's purposes. It cannot be invoked merely because he has a conflict of interest or because he is not acting primarily for his principal" (*Center*, 66 NY2d at 784-785 [emphasis added]). This rule avoids ambiguity where there is a benefit to both the insider and the corporation, and reserves this most narrow of exceptions for those cases—outright theft or looting or embezzlement—where the insider's misconduct

benefits only himself or a third party; i.e., where the fraud is committed *against* a corporation rather than on its behalf.

The rationale for the adverse interest exception illustrates its narrow scope. As already discussed, the presumption that an agent will communicate all material information to the principal operates except in the narrow circumstance where the corporation is actually the victim of a scheme undertaken by the agent to benefit himself or a third party personally, which is therefore entirely opposed (i.e., "adverse") to the corporation's own interests (*see Center*, 66 NY2d at 784). Where the agent is perpetrating a fraud that will benefit his principal, this rationale does not make sense.

A fraud that by its nature will benefit the corporation is not "adverse" to the corporation's interests, even if it was actually motivated by the agent's desire for personal gain (*Price*, 62 NY at 384). Thus, "[s]hould the 'agent act[ ] both for himself and for the principal,' . . . application of the exception would be precluded" (*Capital Wireless Corp. v Deloitte & Touche*, 216 AD2d 663, 666 [3d Dept 1995], quoting *In re Crazy Eddie Sec. Litig.*, 802 F Supp 804, 817 [ED NY 1992]; *see also Center*, 66 NY2d at 785 [the adverse interest exception "cannot be invoked merely because . . . (the agent) is not acting primarily for his principal"]).

New York law thus articulates the adverse interest exception in a way that is consistent with fundamental principles of agency. To allow a corporation to avoid the consequences of corporate acts simply because an employee performed them with his personal profit in mind would enable the corporation to disclaim, at its convenience, virtually every act its officers undertake. "[C]orporate officers, even in the most upright enterprises, can always be said, in some meaningful sense, to act for their own interests" (*Grede v McGladrey & Pullen LLP*, 421 BR 879, 886 [ND Ill 2009]). A corporate insider's personal interests—as an officer, employee, or shareholder of the company—are often deliberately aligned with the corporation's interests by way of, for example, stock options or bonuses, the value of which depends upon the corporation's financial performance.

Again, because the exception requires adversity, it cannot apply unless the scheme that benefitted the insider operated at the corporation's expense. The crucial distinction is between conduct that defrauds the corporation and conduct that defrauds

others for the corporation's benefit. "Fraud on behalf of a corporation is not the same thing as fraud against it" (*Cenco Inc. v Seidman & Seidman*, 686 F2d 449, 456 [7th Cir 1982]), and when insiders defraud third parties *for* the corporation, the adverse interest exception is not pertinent. Thus, as we emphasized in *Center*, for the adverse interest exception to apply, the agent "must have *totally abandoned* his principal's interests and be acting *entirely* for his own or another's purposes," not the corporation's (*Center*, 66 NY2d at 784-785 [emphasis added]). So long as the corporate wrongdoer's fraudulent conduct enables the business to survive—to attract investors and customers and raise funds for corporate purposes—this test is not met (*Baena*, 453 F3d at 7 ["A fraud by top management to overstate earnings, and so facilitate stock sales or acquisitions, is not in the long-term interest of the company; but, like price-fixing, it profits the company in the first instance"]).

The Litigation Trustee suggests that, to the extent that the adverse interest exception requires harm, "bankruptcy is harm enough" and that, whenever the corporation is bankrupt, "it is fair to assume at the pleading stage" that the adverse interest exception applies. But the mere fact that a corporation is forced to file for bankruptcy does not determine whether its agents' conduct was, at the time it was committed, adverse to the company (*see e.g. Barnes v Hirsch*, 215 App Div 10, 11 [1st Dept 1925] [trustee's claim dismissed where it sought to recover for agents' fraud "practiced on these customers" of debtor rather than debtor itself], *affd* 242 NY 555 [1926]). Even where the insiders' fraud can be said to have caused the company's ultimate bankruptcy, it does not follow that the insiders "totally abandoned" the company. As we have held when considering whether an agent's acts were a fraud on the principal prompted by "selfish" motives, it "is immaterial that it has turned out that it would have been better" for the agent to have acted differently (*Price*, 62 NY at 385; *see also* Restatement [Third] of Agency § 5.04, Comment *c* ["the fact that an action taken by an agent has unfavorable results for the principal does not establish that the agent acted adversely"]).

Critically, the presumption of imputation reflects the recognition that principals, rather than third parties, are best suited to police their chosen agents and to make sure they do not take actions that ultimately do more harm than good (*see Cenco*, 686 F2d at 455 ["if the owners of the corrupt enterprise are allowed

to shift the costs of its wrongdoing entirely to the auditor, their incentives to hire honest managers and monitor their behavior will be reduced"]; *see also* Restatement [Third] of Agency § 5.03, Comment *b* ["Imputation creates incentives for a principal to choose agents carefully and to use care in delegating functions to them"]).

Consistent with these principles, any harm from the discovery of the fraud—rather than from the fraud itself—does not bear on whether the adverse interest exception applies. The disclosure of corporate fraud nearly always injures the corporation. If that harm could be taken into account, a corporation would be able to invoke the adverse interest exception and disclaim virtually every corporate fraud—even a fraud undertaken for the corporation's benefit—as soon as it was discovered and no longer helping the company.

Finally, to focus on harm from the exposure of the fraud would be a step away from the requirement of adversity. Generally, a fraud will suit the interests of both a company and its insiders for as long as it remains a secret (sometimes a considerable number of years, as was the case with Refco), and leads to negative consequences for both when disclosed.

## III.

The Litigation Trustee and the derivative plaintiffs encourage us to broaden the adverse interest exception or revise New York precedents relating to in pari delicto or imputation for reasons of public policy—specifically, as they put it, to recompense the innocent and make outside professionals (especially accountants) responsible for their negligence and misconduct in cases of corporate fraud. Although they do not stress the point, their proposals to revise imputation rules are limited to in pari delicto cases. No one disputes that traditional imputation principles, including a narrowly confined adverse interest exception, should remain unchanged—indeed, are essential—in other contexts. For example, in a suit against Refco or AIG by an innocent victim of the frauds, no one would suggest that the wrongful acts of the corporate insiders could not be attributed to their principals. Instead, the Litigation Trustee and the derivative plaintiffs advance various ways for us to reformulate New York law where in pari delicto is in issue. All their proposals push the adverse interest exception up to, if not beyond, the point of extinction. We next explore these proposals and consider whether our precedent remains anchored in sound public policy and workable.

Subjective Intent and Illusory Benefits

First, the Litigation Trustee advocates that we "adopt the rule of *CBI*, under which the insiders' intent is the touchstone and a short term, illusory benefit to the company does not defeat the adverse interest exception." The derivative plaintiffs similarly argue that analysis of the adverse interest exception should focus on the agent's overall intent.

As an initial matter, it is not entirely clear that *CBI* stands for any such far-reaching "rule." *CBI* held that plaintiff Bankruptcy Services, Inc. (BSI), CBI's successor under its bankruptcy plan, possessed standing by virtue of the adverse interest exception to assert claims against its outside accountants arising from their performance of pre-bankruptcy audits of CBI. This was so because "[t]he bankruptcy court's finding that CBI's management 'was acting for its own interest and not that of CBI' [was] not clearly erroneous and constitute[d] the 'total abandonment' of [the] corporation's interests necessary to satisfy the adverse interest exception" (*CBI*, 529 F3d 432, 438 [2008]). In particular, the bankruptcy court found as a matter of fact that "the fraud was perpetrated for the purpose of obtaining a bigger bonus for [CBI's president and CEO and principal shareholder], and to preserve [his] personal control over the company" (*id.* at 449). Further, the bankruptcy court found as a matter of fact that CBI would have sold for almost $28 million as late as October 1993, about 10 months before it declared bankruptcy (*id.* at 453). The ongoing plundering practiced by its president, and not flagged by the accountants as early as the bankruptcy court determined it should have been, deprived the company of this opportunity to sell equity for value.

 Giving a broad reading to the Second Circuit's opinion in *CBI*, the Litigation Trustee asks us to make availability of the adverse interest exception depend upon whether "corrupt insiders intend to benefit themselves at the company's expense" to be "alleged and proved by showing that the corrupt insiders intended to benefit themselves personally *and* actually received personal benefits *and/or* that the company received only short term benefits but suffered long term harm" (emphasis added). To recast the adverse interest exception in this fashion, as the District Court pointed out, would "explode" the exception, turning it into a "nearly impermeable rule barring imputation" in every case (*Kirschner v Grant Thornton LLP*, 2009 WL 1286326, *7 n 14, 2009 US Dist LEXIS 32581, *27-28 n 14 [2009]). This is so because fraudsters are presumably not, as a general rule,

motivated by charitable impulses, and a company victimized by fraud is always likely to suffer long-term harm once the fraud becomes known. The Trustee's proposed rule would limit imputation to fraudsters so inept they gain no personal benefit and unexposed frauds, which is another way of saying the adverse interest exception would become a dead letter because it would encompass every corporate fraud prompting litigation.

The *NCP* and *AHERF* Rules

■ Alternatively, the Litigation Trustee urges us to take the approach to in pari delicto and imputation adopted by the New Jersey Supreme Court in 2006 (*NCP Litig. Trust v KPMG LLP*, 187 NJ 353, 901 A2d 871 [2006]) (supported by the derivative plaintiffs as well), or the Pennsylvania Supreme Court earlier this year (*Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v PricewaterhouseCoopers, LLP*, 989 A2d 313 [Pa 2010] [hereinafter *AHERF*]). Our sister states fashioned carve-outs from traditional agency law in cases of corporate fraud so as to deny the in pari delicto defense to negligent or otherwise culpable outside auditors (New Jersey) and collusive outside professionals (Pennsylvania). Thus, the adverse interest exception, while not abolished, is again rendered beside the point.

In the *NCP* case, two corporate officers of Physician Computer Network, Inc. (PCN), a publicly traded company that developed and marketed health care-related software, intentionally misrepresented PCN's financial status to investors and to the company's accounting firm, KPMG. After KPMG uncovered the fraud by spotting and reporting certain accounting irregularities, PCN's fortunes quickly sank, leading to bankruptcy and significant investor losses. Various shareholder groups filed lawsuits against PCN and the two corporate wrongdoers, and garnered cash settlements.

In addition, the NCP Litigation Trust was set up pursuant to PCN's confirmed bankruptcy plan for the purpose of pursuing causes of action for the benefit of corporate shareholders. The Trust filed suit against KPMG, alleging as follows: "KPMG negligently failed to exercise due professional care in the performance of its audits and in the preparation of the financial statements and audit reports. Had KPMG not performed negligently, and had it instead exercised due care, it would have detected PCN's fraud and prevented the losses PCN suffered" (187 NJ at 363, 901 A2d at 876-877).

When KPMG raised the affirmative defense of in pari delicto, the New Jersey Supreme Court held that "when an auditor is negligent within the scope of its engagement, the imputation doctrine does not prevent corporate shareholders from seeking to recover" (187 NJ at 384, 901 A2d at 890). These corporate shareholders must be "innocent," though: an auditor may still assert the "imputation defense" against those shareholders who engaged in the fraud; or who, by way of their role in the company, should have been aware of the fraud; or who owned large blocks of stock and therefore arguably possessed some ability to oversee the company's operations (187 NJ at 377-378, 901 A2d at 885-886). Thus, the New Jersey rule calls for the relative faults of the company/shareholders and auditors to be sorted out by the factfinder as matters of comparative negligence and apportionment.

The *AHERF* case involved a nonprofit operator of health care facilities, which embarked upon an aggressive campaign to acquire hospitals, medical schools and physicians' practices in pursuit of an integrated health care delivery system. This business model did not produce the anticipated cost savings and income streams, though, and by 1996 AHERF was losing money. AHERF's chief executive and financial officers allegedly knowingly misstated AHERF's finances in figures they provided to the organization's outside auditor, Coopers and Lybrand (now PwC) in 1996 and 1997 to hide the corporation's substantial operating losses.

AHERF filed for bankruptcy in July 1998, and a committee of unsecured creditors, acting on the debtor's behalf, then brought claims against AHERF's insiders as well as PwC in federal district court. The claims against PwC alleged professional negligence, breach of contract, and aiding and abetting the breach of fiduciary duty by the AHERF officers. The committee's theory was that PwC's audits in 1996 and 1997 should have brought management's misstatements to light, but rather than issuing an adverse opinion as generally accepted accounting principles (GAAP) and generally accepted accounting standards (GAAS) required, PwC knowingly assisted in the corporate insiders' misconduct by issuing "clean" opinions. As a result, the committee contended, AHERF's board of trustees was under the false impression that AHERF was in relatively good financial shape and so did not call a halt to the CEO's acquisition binge until it was too late to save the corporation.

The District Court granted PwC's motion for summary judgment, finding no material issue of fact excepting the wrongdo-

ing of AHERF"'s senior management from imputation to AHERF, and no factual or equitable bar to application of the doctrine of in pari delicto (*Official Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v PricewaterhouseCoopers, LLP*, 2007 WL 141059, *15, 2007 US Dist LEXIS 3331, *48-49 [WD Pa 2007]). The committee appealed, arguing that imputation was inapplicable because the auditors were alleged to have wrongfully colluded with AHERF"'s insiders in misstating the corporation's finances. Concluding that the appeal presented issues of first impression under Pennsylvania law, the Third Circuit Court of Appeals certified questions to the Pennsylvania Supreme Court seeking clarification of "the appropriate test under Pennsylvania law for deciding whether imputation [was] appropriate when the party invoking that doctrine [was] not conceded to be an innocent third party, but an alleged co-conspirator in the agent's fraud" (*Official Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v PricewaterhouseCoopers, LLP*, 2008 WL 3895559, *4, 2008 US App LEXIS 18823, *13-14 [3d Cir 2008]).

The Pennsylvania Supreme Court first rejected the approach taken by New Jersey, concluding that "the best course . . . for Pennsylvania common law [was] to continue to recognize the availability of the *in pari delicto* defense . . . , via the necessary imputation, in the negligent-auditor context" where the plaintiff's culpability was equal to or greater than the defendant's (*AHERF*, 989 A2d at 335). But as to the issue of auditor collusion presented by the Third Circuit's certification, the court took a different view, holding that imputation (and therefore the in pari delicto defense) was unavailable where an auditor had not proceeded in material good faith (*id.* at 336-338).[5] In light of the Pennsylvania Supreme Court's clarifying opinion,

---

**5.** Although the Pennsylvania rule (unlike the New Jersey rule) permits in pari delicto to be asserted as a basis for a pretrial motion to dismiss in negligent-auditor cases, any benefit to defendants may prove more speculative than real, depending upon Pennsylvania's pleading rules. Savvy plaintiffs might allege auditor participation and knowing involvement in the illegal activities of corporate management in every case in order to try to dodge dismissal. And

> "[w]hile there will no doubt be cases in which the 'innocence' of the auditors is apparent from the face of the complaint, many other cases will be far from clear. For example, if the audit team questions management about certain revenue recognition practices and then 'passes' audit exceptions to those items as immaterial, is the plaintiff entitled to the favorable inference of 'knowing participation' by the auditor in response to a motion to

the Third Circuit subsequently held that when a third party, such as an auditor, colludes with agents to defraud their principal, "Pennsylvania law requires an inquiry into whether the third party dealt with the principal in good faith," and remanded to the District Court to conduct such an inquiry (*Official Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v PricewaterhouseCoopers, LLP*, 607 F3d 346, 348 [3d Cir 2010]).

The *NCP* and *AHERF* decisions were both animated by considerations of equity—the notion that although the plaintiffs stood in the shoes of the principal malefactors, any recovery they achieved from the defendant accounting firms—which were alleged to have been either negligent or complicit—would, in fact, only benefit innocent shareholders or unsecured creditors and so should not be barred by in pari delicto. The Pennsylvania Supreme Court reflected this sentiment when it said that it would be "ill-advised, if not perverse" to "apply[ ] imputation as against AHERF" because that "would result in the corporation being charged with knowledge as against a third party whose agents actively and intentionally prevented those in AHERF's governing structure who were non-participants in the fraud from acquiring such knowledge" (*AHERF*, 989 A2d at 336).

Comparative Negligence

▇ Finally, the Litigation Trustee suggests that any in pari delicto defense "should not be a total bar to recovery, but at most a basis for apportionment of fault and damages as between the defendant and the company's successor trustee" under CPLR 1411. The derivative plaintiffs go even further, claiming that in pari delicto was abolished when the Legislature enacted CPLR 1411 in 1975. As PwC points out, though, there is no reason to suppose that the *statute* did away with common-law defenses based on intentional conduct, such as in pari delicto, although we could presumably reinterpret New York common law in this area to provide for comparative fault, as New Jersey has done. The effect again would be to marginalize the adverse interest exception. And, of course, comparative fault contradicts the public policy purposes at the heart of in pari delicto—deterrence and the unseemliness of the judiciary "serv-

dismiss?" (*See* Gentile, *AHERF Ruling: Limitation of Imputation for Auditors*, http://www.law360.com/printarticle/175825 [June 18, 2010].)

[ing] as paymaster of the wages of crime" (*Stone*, 298 NY at 271).

Public Policy

This case reduces down to whether, and under what circumstances, we choose to reinterpret New York common law to permit corporations to shift responsibility for their own agents' misconduct to third parties. The Litigation Trustee and the derivative plaintiffs, with whom the dissent agrees, ask us to do this as a matter of public policy in order to compensate the innocent and deter third-party professional (and, in particular, auditor) misconduct and negligence.

On the first point, the Litigation Trustee and the derivative plaintiffs urge us to consider that, although they both stand in the shoes of corporate malefactors, any recovery they achieve will, in fact, benefit blameless unsecured creditors (in the Refco case) and shareholders (in the AIG case) at the expense of defendants who allegedly assisted the fraud or were negligent. They ask us to broaden the adverse interest exception and create exceptions to imputation along the lines adopted by the courts in *NCP* and *AHERF*, and endorsed by the dissent, in the interests of fairness. We are not persuaded, however, that the equities are quite so obvious. In particular, why should the interests of innocent stakeholders of corporate fraudsters trump those of innocent stakeholders of the outside professionals who are the defendants in these cases? The costs of litigation and any settlements or judgments would have to be borne, in the first instance, by the defendants' blameless stakeholders; in the second instance, by the public (*see Securities & Exch. Commn. v Tambone*, 597 F3d 436, 452-453 [1st Cir 2010, Boudin, J., concurring] ["No one sophisticated about markets believes that multiplying liability is free of cost. And the cost, initially borne by those who raise capital or provide audit or other services to companies, gets passed along to the public"]).

In a sense, plaintiffs' proposals may be viewed as creating a double standard whereby the innocent stakeholders of the corporation's outside professionals are held responsible for the sins of their errant agents while the innocent stakeholders of the corporation itself are not charged with knowledge of their wrongdoing agents. And, of course, the corporation's agents would almost invariably play the dominant role in the fraud and therefore would be more culpable than the outside professional's agents who allegedly aided and abetted the insiders or

did not detect the fraud at all or soon enough. The owners and creditors of KPMG and PwC may be said to be at least as "innocent" as Refco's unsecured creditors and AIG's stockholders.

We are also not convinced that altering our precedent to expand remedies for these or similarly situated plaintiffs would produce a meaningful additional deterrent to professional misconduct or malpractice. The derivative plaintiffs caution against dealing accounting firms a "get-out-of-jail-free" card. But as any former partner at Arthur Andersen LLP—once one of the "Big Five" accounting firms—could attest, an outside professional (and especially an auditor) whose corporate client experiences a rapid or disastrous decline in fortune precipitated by insider fraud does not skate away unscathed. In short, outside professionals—underwriters, law firms and especially accounting firms—already are at risk for large settlements and judgments in the litigation that inevitably follows the collapse of an Enron, or a Worldcom or a Refco or an AIG-type scandal. Indeed, in the Refco securities fraud litigation, the IPO's underwriters, including the three underwriter defendants in this action, have agreed to settlements totaling $53 million (www.refcosecuritieslitigation.com). In the AIG securities fraud litigation, PwC settled with shareholder plaintiffs last year for $97.5 million (www.aigsecuritieslitigationpwcsettlement.com). It is not evident that expanding the adverse interest exception or loosening imputation principles under New York law would result in any greater disincentive for professional malfeasance or negligence than already exists.[6] Yet the approach advocated by the Litigation Trustee and the derivative plaintiffs would allow the creditors and shareholders of the company that employs

---

**6.** As a result of Congress's passage of the Sarbanes-Oxley Act of 2002 and the Securities and Exchange Commission's subsequent adoption of implementing rules, external auditors of public companies are also now subject to more rigorous regulatory standards than was the case at the inception of the frauds at Refco and AIG. In other words, carving out exceptions from traditional common-law principles, as the dissent would have us do, is not the only or necessarily the optimal way to address "gatekeeper failure." Indeed, Professor Coffee, whose article the dissent twice cites (see dissenting op at 481 n 2, 482) suggests an "essentially regulatory" approach, whereby the auditor-gatekeeper would be

> "convert[ed] . . . into the functional equivalent of an insurer, who would back its auditor's certification with an insurance policy that was capped at a realistic level. As a result, the gatekeeper's liability would be divorced from any showing of fault, but it would also be limited to a level that achieves adequate deterrence without causing the market for gatekeeping services to unravel" (Coffee, *Gatekeeper Failure and Reform: The Chal-*

miscreant agents to enjoy the benefit of their misconduct without suffering the harm.

The principles of in pari delicto and imputation, with its narrow adverse interest exception, which are embedded in New York law, remain sound. The speculative public policy benefits advanced by the Litigation Trustee and the derivative plaintiffs to vindicate the changes they seek do not, in our view, outweigh the important public policies that undergird our precedents in this area or the importance of maintaining the "stability and fair measure of certainty which are prime requisites in any body of law" (Loughran, *Some Reflections on the Role of Judicial Precedent*, 22 Fordham L Rev 1, 3 [1953]). We are simply not presented here with the rare case where, in the words of former Chief Judge Loughran, "the justification and need" for departure from carefully developed legal principles are "clear and cogent" (*id.*). Finally, to the extent our law had become ambiguous, today's decision should remove any lingering confusion.

Accordingly, the certified questions in *Kirschner v KPMG LLP* and *Teachers' Retirement Sys. of La. v Pricewaterhouse-Coopers LLP* should be answered in accordance with this opinion, including in *Kirschner* that certified question (2) should be answered "No" and certified question (3) should be answered "Yes"; and that in *Teachers' Retirement Sys. of La.*, the certified question should be answered "Yes," assuming the adverse interest exception does not apply.

CIPARICK, J. (dissenting). The majority opinion effectively precludes litigation by derivative corporate plaintiffs or litigation trustees to recover against negligent or complicit outside actors—even where the outside actor, hired to perform essential gatekeeping and monitoring functions, actively colludes with corrupt corporate insiders. In my view, the agency law principles upon which the majority rests its conclusions ignore complex assumptions and public policy that compel different conclusions than those reached by the majority. Accordingly, I respectfully dissent.

As an important threshold matter, the majority acknowledges that under New York law, in pari delicto is an affirmative defense, not a matter of standing (*see* majority op at 459 n 3).

*lenge of Fashioning Relevant Reforms*, 84 BU L Rev 301, 349, 350 [2004]).

The confusion regarding the nature of this doctrine stems from the Second Circuit's *Wagoner* case and its progeny (*see Shearson Lehman Hutton, Inc. v Wagoner*, 944 F2d 114, 118 [2d Cir 1991]; *see also In re CBI Holding Co., Inc.*, 529 F3d 432, 447-448 [2d Cir 2008]; *Wight v BankAmerica Corp.*, 219 F3d 79, 86 [2d Cir 2000]; *Hirsch v Arthur Andersen & Co.*, 72 F3d 1085, 1093 [2d Cir 1995]; *cf. Bullmore v Ernst & Young Cayman Is.*, 20 Misc 3d 667, 670 [Sup Ct, NY County 2008] [distinguishing between the "equitable defense" of in pari delicto and the *Wagoner* "standing doctrine"]), which incorrectly characterize New York's version of in pari delicto as a limitation on standing. The application of in pari delicto as an affirmative defense versus its application as a standing rule is more than merely semantics. Viewing in pari delicto as a matter of standing places the burden of pleading and proof on the plaintiff, while treating the doctrine as an affirmative defense places the burden of pleading and proof on the defendant (*see e.g. Woods v Rondout Val. Cent. School Dist. Bd. of Educ.*, 466 F3d 232, 237 [2d Cir 2006]).[1]

To be sure, even an affirmative defense can, as the majority observes, be decided on the basis of the facts as alleged in the complaint (*see e.g. Donovan v Rothman*, 302 AD2d 238, 239 [1st Dept 2003] [holding Supreme Court properly dismissed plaintiffs' claim on the basis of in pari delicto]). However, to the extent that the majority opinion can be read to suggest that this is the preferable result, or that a pre-answer motion alleging in pari delicto should always result in a dismissal, I respectfully disagree. On a pre-answer motion to dismiss, a court must take as true the allegations of the complaint and give the plaintiff the benefit of every favorable inference that may be drawn from the complaint or from submissions in opposition to the motion (*see Matter of Graziano v County of Albany*, 3 NY3d 475, 481 [2004]; *511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144, 152 [2002]; *Prudential-Bache Sec. v Citibank*, 73 NY2d 263, 266 [1989]). Where complex, fact-based issues abound, pre-answer dismissal should be an exception, not the rule (*see e.g. Morgado Family Partners, LP v Lipper*, 19 AD3d 262, 263 [1st Dept 2005]; *see also In re Adelphia Communica-*

---

1. Significantly, the majority gives the so-called *Wagoner* rule continuing validity, at least in part, by characterizing it as a "prudential limitation on standing" derived from "federal bankruptcy law" (majority op at 459 n 3). In pari delicto, as an affirmative defense, does not bear on a plaintiff's *standing* to assert a claim, only on the relative merits or ultimate success of such a claim. Accordingly, to the extent that *Wagoner* implies that in pari delicto is a matter of standing, I would expressly disapprove of that case and its progeny.

*tions Corp.*, 365 BR 24, 33 [Bankr SD NY 2007] ["issue is not whether a (claim) will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims"]; *Stahl v Chemical Bank*, 237 AD2d 231, 231 [1st Dept 1997] [defense of "unclean hands (which is doctrinally similar to in pari delicto) . . . raises issues that require factual exploration"]). The majority, however, is willing to allow dismissal of the complaints at this early stage of litigation based on agency principles and public policy, effectively creating a per se rule that fraudulent insider conduct bars any actions against outside professionals by derivative plaintiffs or litigation trustees for complicitous assistance to the corrupt insider or negligent failure to detect the wrongdoing. The principles underlying this doctrine do not support such a hard-line stance.

In pari delicto is a long-established tenet of law that instructs courts to refrain from intervening in a dispute between two parties at equal fault (*see e.g. Woodworth v Janes*, 2 Johns Cas 417, 423 [Sup Ct 1800]; *Stone v Freeman*, 298 NY 268, 271 [1948]; *see also Baena v KPMG LLP*, 453 F3d 1, 6 [1st Cir 2006] [in pari delicto "prevent(s) a deliberate wrongdoer from recovering from a co-conspirator or accomplice"]; *see also id.* at 6 n 5). The majority, quoting *McConnell v Commonwealth Pictures Corp.* (7 NY2d 465, 470 [1960]), opines that the doctrine of in pari delicto should apply "even in difficult cases" and "should not be 'weakened by exceptions' " (majority op at 464). However, those decisions that have characterized the principle as "inflexible" (*see Saratoga County Bank v King*, 44 NY 87, 94 [1870]) or "not to be weakened" (*McConnell v Commonwealth Pictures Corp.*, 7 NY2d 465, 470 [1960]) have recognized that the doctrine is premised on concepts of morality, fair dealing and justice (*see McConnell*, 7 NY2d at 470; *Saratoga*, 44 NY at 94; *see also Bateman Eichler, Hill Richards, Inc. v Berner*, 472 US 299, 306-307 [1985] [under the "classic formulation" of in pari delicto "(t)here may be on the part of the court itself a necessity of supporting the public interests or public policy in many cases, however reprehensible the acts of the parties may be"]). It is therefore clear that the concept of in pari delicto is not a rigid concept, incapable of shaping itself to the particulars of an individual case.

Before the in pari delicto doctrine can be applied to circumstances such as those presented here, the actions of the corrupt insider/agent must be found to be attributable to the corporate entity/principal. As the majority observes, the agency law rule

of imputation generally presumes that a principal knows and approves of the acts of, and shares the knowledge of, its agent (*see generally Center v Hampton Affiliates*, 66 NY2d 782, 784 [1985]). This "general rule" is undergirded by the "presumption that an agent has discharged his duty to disclose to his principal 'all the material facts coming to his knowledge with reference to the subject of his agency' " (*id.*, quoting *Henry v Allen*, 151 NY 1, 9 [1896]).

An agent's actions and knowledge cannot be imputed to the principal, however, if the "agent is engaged in a scheme to defraud his principal, either for his own benefit or that of a third person" (*id.*). In such circumstances, "the presumption that knowledge held by the agent was disclosed to the principal fails because he cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose" (*id.*). This adverse interest exception can apply in circumstances where a corrupt corporate insider acts for its own benefit, rather than for the benefit of its principal. The majority rejects the premise that the adverse interest exception should depend on a "case-by-case assessment of whether" an agent is likely to communicate information to its principal (majority op at 466). Rather, the majority observes that considerations of public policy—including incentivizing the selection of honest agents and careful delegation of duties—require strict imputation. Moreover, the majority reasons that a limited application of the adverse interest exception—where virtually any benefit to the corporation/principal will defeat the exception—serves the same purposes (*see* majority op at 468-469), and rejects plaintiffs' arguments that an agent's intent is relevant to the adverse interest analysis. The majority also concludes that the adverse interest exception requires a showing of harm, and rejects plaintiffs' argument that benefits to the principal which are merely illusory do not defeat the exception.

It is axiomatic that the adverse interest exception requires a showing of harm to the principal, but the premise that even an illusory benefit to a principal can serve to defeat the adverse interest exception to imputation misses the point. As the Second Circuit noted in *CBI Holding*, a "corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it" (529 F3d at 453, quoting *In re Investors Funding Corp. of N.Y. Sec. Litig.*, 523 F Supp 533, 541 [SD NY 1980]). Indeed, "[p]rolonging a corporation's existence in the face of ever increasing insolvency may be 'doing no more

than keeping the enterprise perched at the brink of disaster' " (*id.*, quoting *In re Maxwell Newspapers, Inc.*, 164 BR 858, 869 [Bankr SD NY 1994]). As was borne out here, in the case of Refco, insider fraud that merely gives the corporation life longer than it would naturally have is not a true benefit to the corporation but can be considered a harm. The majority's assertion that any corporate insider fraud that "enables the business to survive" defeats the adverse interest exception (majority op at 468) would, as alleged here, condone the actions of the defendants.

Moreover, in the corporate context where the fraud committed by corrupt insiders is either enabled by, joined in, or goes unnoticed by outside "gatekeeper" professionals,[2] the use of these simple agency principles in such a manner has been rightfully criticized (*see NCP Litig. Trust v KPMG LLP*, 187 NJ 353, 368, 901 A2d 871, 880 [2006], quoting Morris, *Clarifying the Imputation Doctrine: Charging Audit Clients with Responsibility for Unauthorized Audit Interference*, 2001 Colum Bus L Rev 339, 353 [2001]). One commentator has observed that the results seemingly required by imputation and in pari delicto are "severe and unmodulated by concern for the specifics of individual cases" (DeMott, *When is a Principal Charged with an Agent's Knowledge?*, 13 Duke J Comp & Intl L 291, 319 [2003]). Indeed, these simplistic agency principles as applied by the majority serve to effectively immunize auditors and other outside professionals from liability wherever any corporate insider engages in fraud.

Important policy concerns militate against the strict application of these agency principles. There can be little doubt that the role played by auditors and other gatekeepers serves the public as well as the corporations that contract for such services. Investors rely heavily on information prepared by or approved by auditors, accountants, and other gatekeeper professionals. Corporate financial statements, examined by ostensibly independent auditors, "are one of the primary sources of information available to guide the decisions of the investing public" (*United States v Arthur Young & Co.*, 465 US 805, 810-811 [1984]). It is, therefore, in the public's best interest to maximize diligence and thwart malfeasance on the part of gatekeeper

---

2. Obvious examples of what are sometimes referred to as "gatekeepers" include auditors, accountants, and law firms (*see generally* Coffee, *Gatekeeper Failure and Reform: The Challenge of Fashioning Relevant Reforms*, 84 BU L Rev 301, 308-309 [2004]).

professionals (*see generally* Coffee, *Gatekeeper Failure and Reform*, 84 BU L Rev at 345-346 ["public policy must seek to minimize the perverse incentives that induce the gatekeeper not to investigate too closely"]; Shapiro, *Who Pays the Auditor Calls the Tune?: Auditing Regulation and Clients' Incentives*, 35 Seton Hall L Rev 1029, 1034 [2005] [the purpose of audits is to "provide some independent assurance that those entrusted with resources are made accountable to those who have provided the resources"]).

Moreover, it is unclear how immunizing gatekeeper professionals, as the majority has effectively done, actually incentivizes corporate principals to better monitor insider agents. Indeed, it seems that strict imputation rules merely invite gatekeeper professionals "to neglect their duty to ferret out fraud by corporate insiders because even if they are negligent, there will be no damages assessed against them for their malfeasance" (Pritchard, *O'Melveny Meyers v FDIC: Imputation of Fraud and Optimal Monitoring*, 4 Sup Ct Econ Rev 179, 192 [1995]).

For these and other reasons, our sister courts in New Jersey and Pennsylvania have carved out exceptions or limitations to the imputation and in pari delicto rules. In *NCP Litig. Trust v KPMG LLP* (187 NJ 353, 901 A2d 871 [2006]), the Supreme Court of New Jersey held that "when an auditor is negligent within the scope of its engagement, the imputation doctrine does not prevent corporate shareholders from seeking to recover" (187 NJ at 384, 901 A2d at 890). That court explained its rationale for adopting such a rule as follows: "A limited imputation defense will properly compensate the victims of corporate fraud without indemnifying wrongdoers for their fraudulent activities. To the extent that shareholders are innocent of corporate wrongdoing, our holding provides just compensation to those plaintiffs" (*id.*).

In explaining its newly-drawn good faith exception or limitation on the rules of imputation and in pari delicto, the Supreme Court of Pennsylvania observed that

> "the appropriate approach to benefit and self-interest [as those concepts inform the decision whether to impute an insider's conduct to the corporate entity] is best related back to the underlying purpose of imputation, which is fair risk-allocation, including the affordance of appropriate protection to those who transact business with

corporations" (*Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v PricewaterhouseCoopers, LLP*, 989 A2d 313, 335 [2010] [hereinafter *AHERF*]).

Accordingly, that court drew a "sharp distinction between those who deal in good faith with the principal-corporation in material matters and those who do not" (*id.*). Ultimately, the court continued to "recognize the availability of the *in pari delicto* defense (upon appropriate and sufficient pleadings and proffers), via the necessary imputation, in the negligent-auditor context" (*id.*). As to auditor collusion, however, the Pennsylvania Supreme Court explained that "the ordinary rationale supporting imputation breaks down completely in scenarios involving secretive, collusive conduct between corporate agents and third parties . . . because imputation rules justly operate to protect third parties on account of their reliance on an agent's actual or apparent authority" (*id.* at 336).[3] Accordingly, the court held that imputation—and therefore in pari delicto—"do[es] not (and should not) apply in circumstances in which the agent's authority is neither actual nor apparent, as where both the agent and the third party know very well that the agent's conduct goes unsanctioned by one or more of the tiers of corporate governance" (*id.*).

In conclusion, I do not quarrel with the majority's statements of the applicable principles of agency law. Rather, my departure is from the majority's rigid application of those principles to cases by litigation trustees and derivative plaintiffs against gatekeeper professionals for enabling corporate insider fraud by colluding in or failing to detect such fraud. I agree with the litigation trustee and the derivative plaintiffs that no equitable basis exists for holding that litigation trustees or derivative plaintiffs are in pari delicto with culpable outside professionals. Indeed, in my view, the weight of the equities favors allowing

---

**3.** Bearing on the underlying premises supporting imputation, agency law generally holds a principal responsible for the actions of an agent that are taken with actual or apparent authority (*see generally Standard Funding Corp. v Lewitt*, 89 NY2d 546, 549 [1997]; *Hallock v State of New York*, 64 NY2d 224, 231 [1984]). Whether apparent authority exists is a fact-based determination requiring inquiry into the conduct of the principal. In other words, apparent authority may exist if the principal's conduct has given rise "to the appearance and belief that the agent possesses authority to" act with respect to the third party (*Hallock*, 64 NY2d at 231). Notably, a third party with whom the agent deals may only rely on an appearance of authority to the extent that such reliance is reasonable (*see id.*, citing *Wen Kroy Realty Co. v Public Natl. Bank & Trust Co.*, 260 NY 84, 92-93 [1932]).

suits such as these to go forward to deter active wrongdoing or negligence by auditors and similar professionals (*see generally O'Melveny & Myers v FDIC*, 512 US 79, 90 [1994, Stevens, J., concurring]). Moreover, I am persuaded by the sound rationales employed by our sister state courts in the *AHERF* case and the *NCP Litig. Trust* case that a more reasonable approach is to recognize a carve-out or exception to the in pari delicto doctrine for cases involving corporate insider fraud enabled by complicit or negligent outside gatekeeper professionals.

Accordingly, I would answer the certified questions from both the Second Circuit and the Delaware Supreme Court in accordance with this writing.

Judges GRAFFEO, SMITH and JONES concur with Judge READ; Judge CIPARICK dissents in a separate opinion in which Chief Judge LIPPMAN and Judge PIGOTT concur.

In *Kirschner v KPMG LLP*: Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.27 of the Rules of Practice of the New York State Court of Appeals (22 NYCRR 500.27), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified questions answered in accordance with the opinion herein.

In *Teachers' Retirement Sys. of La. v PricewaterhouseCoopers LLP*: Following certification of a question by the Supreme Court of Delaware and acceptance of the question by this Court pursuant to section 500.27 of the Rules of Practice of the New York State Court of Appeals (22 NYCRR 500.27), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered in accordance with the opinion herein.