■ SAVIK, MURRAY & AURORA CONSTRUCTION MANAGEMENT CO., LLC, Appellant, v ITT HARTFORD INSURANCE GROUP et al., Respondents, et al., Defendant. [927 NYS2d 634]—

This is an action for a judgment granting reimbursement of defense costs and declaring that defendants, plaintiff's insurers, were obligated to defend and indemnify plaintiff in an arbitration proceeding brought by Farmingdale Development Corporation (FDC). On this record, we find, as a matter or law, that Hartford and QBE did not receive timely notice of the underlying occurrence as required by their respective policies. Plaintiff is a limited liability company managed by Frank Vero, Sr. and two other managing members. In 1998, plaintiff began its work as the construction manager in the development of a shopping center pursuant to a written agreement with FDC, the owner. As to this project, plaintiff was an additional insured under standard commercial general liability policies issued by Hartford and QBE. A third carrier, defendant the Insurance Corp. of New York, is now in rehabilitation. Aurora Construction, Inc. performed construction management duties on behalf of plaintiff. Vero, who was Aurora's president, owned its stock solely or jointly with his son at different times. Plaintiff left the job site in May 2000, three months after the project was substantially completed. As confirmed by a September 1999 letter signed by Joseph Koslow, plaintiff's project executive, the project had been plagued by numerous ongoing roof leaks.*

On or about May 12, 2004, FDC served plaintiff with an arbitration demand, which cited plaintiff's failure to take action with respect to the construction of the project's roofing system and parapets. According to the arbitration demand, extensive roof leaks occurred in all of the project's buildings. It was not until June 4, 2004 that plaintiff notified Hartford and QBE of FDC's claim or the occurrence. Both carriers thereupon issued reservation of rights letters and, after plaintiff commenced this action, moved for summary judgment. The grounds for summary judgment asserted by Hartford and QBE included plaintiff's purported breach of a provision in each of their policies that required plaintiff, as the insured, to notify the respective carrier, as soon as practicable, of "an 'occurrence' or an offense which may result in a claim." The motion court granted summary judgment and dismissed the complaint on the ground that the underlying claim came under the work product exclusion of each of the applicable policies. Upon granting leave to

---

* In the letter, Koslow advised the addressee, a subcontractor, to notify its insurance company of the problem, which Koslow described as an apparent "disaster on *our* hands" (emphasis added).

reargue, the court again ruled in favor of Hartford and QBE, finding that the costs FDC sought to recover in the underlying arbitration arose out of plaintiff's work product. For reasons that follow, the judgment below should be modified on the late notice-of-occurrence ground that was asserted by Hartford and QBE but never addressed by the motion court.

"Where a policy of liability insurance requires that notice of an occurrence be given 'as soon as practicable,' such notice must be accorded the carrier within a reasonable period of time" (*Great Canal Realty Corp. v Seneca Ins. Co., Inc.*, 5 NY3d 742, 743 [2005] [citation omitted]). "The insured's failure to satisfy the notice requirement constitutes 'a failure to comply with a condition precedent which, as a matter of law, vitiates the contract' " (*id.* [citation omitted]). Nevertheless, circumstances that give rise to an insured's "good-faith belief of nonliability may excuse or explain a seeming failure to give timely notice" (*Security Mut. Ins. Co. of N.Y. v Acker-Fitzsimons Corp.*, 31 NY2d 436, 441 [1972]).

By an August 11, 2003 letter to the roofing manufacturer, John A. Buchholz, the project's architect stated, among other things, that FDC was prepared to have the roof leaks repaired and begin litigation with plaintiff and others. The letter indicates that it was carbon copied to Vero. Plaintiff does not challenge the admissibility of the letter. Instead, plaintiff coyly asserts that there is nothing in the record to confirm that Vero received a copy of the letter. This assertion rings hollow as plaintiff has not submitted an affidavit on this or any other issue by Vero or, for that matter, either of plaintiff's other two members. To be sure, plaintiff never denied that it received Buchholz's letter in 2003. Plaintiff skirted the issue of notice of the occurrence by submitting the affidavit of Nicholas R. Aldorisio, Aurora's chief financial officer, who merely stated that "[t]he first actual notice to [plaintiff] of an affirmative claim by Farmingdale occurred when [plaintiff] received Farmingdale's demand for arbitration on or about May 2004." Aldorisio's affidavit begs the question because it addresses plaintiff's receipt of a formal claim as opposed to its knowledge of an " 'occurrence' or offense which may result in a claim." An insured's duty to timely report an occurrence is distinct from its duty to report a claim (*American Tr. Ins. Co. v Sartor*, 3 NY3d 71, 75 [2004]).

Hartford and QBE made prima facie showings of entitlement to judgment as a matter of law based upon plaintiff's 4½-year delay in notifying them of the occurrence (*see e.g. Sorbara Constr. Corp. v AIU Ins. Co.*, 11 NY3d 805, 806 [2008]). In op-

position, plaintiff was required to demonstrate the existence of actual issues of fact by assembling and laying bare proofs in order to show that its claims are capable of being established at trial (cf. *Machinery Funding Corp. v Loman Enters.*, 91 AD2d 528, 528 [1982]). On the basis of the construction management agreement, the dissent posits that there is an issue of fact as to whether plaintiff had a reasonable belief in its nonliability. The record does not support the dissent's conclusion because there is no affidavit setting forth what plaintiff believed or did not believe at the time of the occurrence or thereafter. For this reason, plaintiff's failure to submit an affidavit by any of its members is fatal. Hence, plaintiff has failed to raise a triable factual issue as to whether there was a reasonable excuse for its delay in notifying Hartford and QBE of the occurrence.

We also reject plaintiff's claim of a reasonable excuse. In *Ferreira v Mereda Realty Corp.* (61 AD3d 463 [2009]), we found that "the insureds could not have reasonably believed that there would be no litigation arising out of the accident," once they acquired knowledge of the seriousness of the underlying injury. In *Eveready Ins. Co. v Levine* (145 AD2d 526, 528 [1988]), the Second Department found that an insured's "bare reliance upon the fact that no one complained of any bodily injuries at the time of the accident" did not excuse the insured's failure to notify its carrier until after suit was commenced. By contrast, in *Kambousi Rest., Inc. v Burlington Ins. Co.* (58 AD3d 513, 515 [2009]), we held that a good faith belief in nonliability was established by statements and actions of an injured patron and her husband that led the insured restauranteur to believe that the couple would not seek to hold the insured liable for a trip-and-fall accident. Like the insureds in *Ferreira* and *Eveready*, plaintiff appreciated the seriousness of the occurrence and its potential for liability. Indeed, as footnoted above, early on in the project, plaintiff's project executive saw fit to advise a subcontractor to notify its own carrier about the "disaster." Unlike the insured in *Kambousi*, however, plaintiff offered no evidence of any representation that could have reasonably led it to believe that FDC would not seek to hold it liable.

Correspondence sent by Aurora also establishes when plaintiff acquired notice of the underlying occurrence. On or about December 4, 2003, Aurora apparently faxed a letter from Buchholz to plaintiff's counsel. The fax cover sheet reads as follows: "Attached please find a letter received from John Buchholz regarding the roof leak issue at Airport Plaza. We have written correspondence in the past detailing our position as construction manager. Please draft an appropriate response." By way of

another fax cover sheet, dated February 2, 2004, Aurora informed counsel that it appeared that the owner was blaming Aurora for the leaks. Although they are separate entities, Aurora was plaintiff's agent. It is settled that knowledge acquired by an agent acting within the scope of its authority is presumptively imputed to its principal (*Kirschner v KPMG LLP*, 15 NY3d 446, 465 [2010]). Plaintiff has failed to rebut this presumption, particularly in light of its close relationship with Aurora.

"An insurer's duty to defend is liberally construed and is broader than the duty to indemnify," in order to ensure an adequate defense of the insured, "without regard to the insured's ultimate likelihood of prevailing on the merits of a claim" (*Fieldston Prop. Owners Assn., Inc. v Hermitage Ins. Co., Inc.*, 16 NY3d 257, 264 [2011]). A liability insurer has a duty to defend its insured in pending litigation if the pleadings allege a covered occurrence, even though the facts outside the four corners of those pleadings indicate that the claim may be meritless or not covered (*Fitzpatrick v American Honda Motor Co.*, 78 NY2d 61, 63 [1991]). Thus, timely notice of the occurrence would have required Hartford and QBE to defend plaintiff in the arbitration proceeding inasmuch as the owner's arbitration claim included the costs of the repair of water damage and the remediation of mold conditions in various tenant spaces. Such costs would be associated with a legal liability incurred by property damage to something other than plaintiff's work product (*see e.g. George A. Fuller Co. v United States Fid. & Guar. Co.*, 200 AD2d 255, 259 [1994], *lv denied* 84 NY2d 806 [1994]). In any event, plaintiff's failure to provide Hartford and QBE with timely notice of the underlying occurrence is dispositive.

As this is an action for a declaratory judgment, the rights of the parties should have been declared (*see Medical World Publ. Co. v Kaufman*, 29 AD2d 859 [1968]). The mere dismissal of the complaint, as recited by the judgment the court adhered to, is not an affirmative declaration of the parties' rights (*id.*). Accordingly, the rights of the parties are declared as indicated above (*see e.g. 600 W. 115th St. Corp. v 600 W. 115th St. Condominium*, 180 AD2d 598, 598 [1992]). Concur—Sweeny, DeGrasse and Abdus-Salaam, JJ.

Andrias, J.P., and Moskowitz, J., dissent in a memorandum by Andrias, J.P., as follows: Although the majority finds that the work product exclusions in the subject commercial general liability (CGL) policies are inapplicable and would not, in and of themselves, bar plaintiff's claim for its defense costs in the underlying arbitration, they would nevertheless grant summary

judgment dismissing this action on the ground that plaintiff did not provide defendants ITT Hartford Insurance Group (Hartford) and QBE Insurance Corp. (QBE) with notice of the underlying occurrences as soon as practicable. Because I believe that issues of fact exist as to whether there was an "occurrence" within the meaning of the policies, whether the work product exclusions apply, and, if there was an occurrence, whether plaintiff's delay in notifying defendants Hartford and QBE is excusable, I respectfully dissent and would reinstate the complaint.

On or about April 1, 1998, Farmingdale Development Corp. (FDC) retained plaintiff, Savik, Murray & Aurora Construction Management Co., LLC (SMA), as construction manager for its Airport Plaza shopping center project (the project). Under the construction management agreement (CMA), SMA, as FDC's agent, was to arrange for, coordinate and supervise the provision of all labor, materials, services and equipment for the project "in accord with plans and specifications" prepared by FDC's architect or other professional designer, and assist FDC in its dealings with contractors and suppliers to enforce warranties. SMA retained Aurora Construction, Inc. (Aurora), owned by Frank Vero, Sr., a managing member of SMA, to provide personnel to perform SMA's duties under the CMA. Aurora or Expressway Acoustics (Expressway), a division of Aurora, was retained by FDC as a carpentry contractor.

The project was substantially completed by February 2000. SMA left the job site in May 2000. On or about May 12, 2004, FDC filed a demand for arbitration seeking $872,249.96 in damages from SMA for "breach of the [CMA] which required SMA to, among other things, supervise tradesman in the construction of the Airport Plaza by assuring that said tradesman comply with the architectural plans." FDC alleged that SMA failed to "take action against the relevant tradesman concerning the construction of the roofing system and parapets on Phase I and II of the project," which resulted in persistent and extensive roof leaks; failed "to require tradesman to perform their respective tasks in accordance with approved methods [which] resulted in other structural damage to the buildings"; and failed to "obtain the required roof warranties."

SMA was an additional insured under CGL policies issued by Hartford and QBE which covered "Property damage," including "physical injury to tangible property, including all resulting loss of use of that property," caused by an occurrence during the policy period. An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

The policies exclude property damage to: "That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations; or . . . [t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it" (work product exclusion).

They also contain a notice provision which provides: "You Must see to it that we are notified as soon as practicable of an 'occurrence' . . . which may result in a claim." The Hartford policy was effective from March 16, 1998 to May 3, 2000; the QBE policy from March 15, 2002 to March 15, 2005.

On June 4, 2004, SMA put QBE and Hartford on notice of FDC's claim. By letters dated June 16, 2004 and June 28, 2004, respectively, QBE and Hartford reserved their rights with respect to providing a defense and indemnification. In January 2005, FDC particularized its arbitration claims, asserting that as a result of SMA's breach of the CMA, certain "flashing terminations," "entrance peaks," gutters and sidewalks were not installed in accordance with the contract documents and that leaks passed through the roof and walls of the shopping center, causing mold and water and other property damage. FDC also claimed that due to inadequate insulation a pipe burst in freezing weather, causing additional water damage, and that SMA failed to obtain a "Johns Manvill[e] 15 year no dollar limit warranty with respect to all buildings except buildings A, B and C." FDC estimated that the cost of repair, including "the replacement of the parapet cap assembly and repairing the water damage to various tenant spaces and remediating the mold conditions is $512,500.00." By letter dated March 17, 2005, Hartford disclaimed coverage on the grounds that there was no claim for "property damage" caused by an "occurrence," there was no allegation of property damage during the policy, and the work product exclusion excluded coverage.

On or about June 8, 2006, an arbitration award in the amount of $214,689 was entered in FDC's favor against SMA for breach of contract in connection with the improper installation of the roofing system ($130,737), needed emergency repairs ($11,318), the cost of obtaining the roof warranties ($62,374), and the cost of investigating and remediating the damage ($9,900). SMA then commenced this action seeking reimbursement of defense and indemnification costs.

Supreme Court dismissed the complaint, finding that "the CGL policies did not cover [FDC]'s claims, because SMA was responsible for the entire Project as construction manager, and

any damage to the Project was, in effect, damage caused by SMA's work product, which was excluded from coverage." Upon granting reargument, Supreme Court adhered to this determination, stating that "the damages sought in the underlying arbitration were costs to correct defective installation of walkway canopies, parapet wall sections and metal cap flashing causing water and mold to infiltrate, and did not arise from an 'occurrence' resulting in damage to property distinct from SMA's own work product . . . The damages were allegedly caused by, inter alia, SMA's failure to supervise contractors, their services and the installation of materials in accordance with the project plans and specifications . . . Thus, the costs that [FDC] sought were the costs allegedly incurred to remediate SMA's own work product." Supreme Court did not reach the late notice issue.

While the duty to defend is broader than the duty to indemnify, "it is equally well settled that the obligation of an insurer to defend does not extend to claims which are not covered by the policy or which are expressly excluded from coverage" (*30 W. 15th St. Owners Corp. v Travelers Ins. Co.*, 165 AD2d 731, 733 [1990]). "[A]n insurer can be relieved of its duty to defend if it establishes as a matter of law that there is no possible factual or legal basis on which it might eventually be obligated to indemnify its insured under any policy provision" (*Allstate Ins. Co. v Zuk*, 78 NY2d 41, 45 [1991]).

CGL policies provide coverage for physical damage to others and not for contractual liability of the insured for economic loss due to faulty workmanship or non-bargained-for outcomes (*see George A. Fuller Co. v United States Fid. & Guar. Co.*, 200 AD2d 255, 259 [1994], *lv denied* 84 NY2d 806 [1994]). Hence, courts have typically found no "occurrence" or that the work product exclusion applies in cases involving damage to the product the contractor was to construct (*see Exeter Bldg. Corp. v Scottsdale Ins. Co.*, 79 AD3d 927, 929 [2010] ["because the complaint seeks relief for conduct that falls solely and exclusively under the work product exclusions of the CGL policies, and the damages sought therein do not arise from an occurrence resulting in damage to property distinct from the work product of Exeter or its hired subcontractors, Scottsdale is not obligated to provide Exeter with a defense or to indemnify it in the underlying action"]; *Bonded Concrete, Inc. v Transcontinental Ins. Co.*, 12 AD3d 761 [2004]). In contrast, a covered occurrence may be found where the faulty workmanship "creates a legal liability by causing bodily injury or property damage to something other than the work product" (*Fuller*, 200 AD2d at 259; *see Baker*

*Residential Ltd. Partnership v Travelers Ins. Co.*, 10 AD3d 586 [2004]).

In addition to seeking to recover damages in connection with the improper installation of the roofing system, emergency repairs and the cost of obtaining the roof warranties, FDC sought to recover for "damage to various tenant spaces." On the record before us, issues of fact exist as to whether that damage was an "occurrence" within the meaning of the policy or within the scope of the work product exclusion. Although the insurers claim that SMA was responsible for construction of the entire building, the plans and specifications that would establish the scope of SMA services under section 2.02 of the CMA are not included in the record. While Aurora's vice-president, when asked if Aurora was responsible for supervising Expressway's work, replied that SMA "was responsible for everything, and . . . hired Aurora to supervise," he also stated that he did not think that SMA did any work directly for tenants. According to Aurora's project manager, "SMA did not coordinate and had nothing whatsoever to do with the construction of the interior spaces" and Expressway was retained by certain tenants to perform work in some of the interior spaces, including the installation of Sheetrock and ceiling tiles. The project manager also stated that other tenants retained their own contractors to renovate the raw space delivered by Farmingdale. Thus, there is an issue of fact as to whether the damages sought in the underlying arbitration arise from an occurrence resulting in damage to property distinct from the work product of SMA.

That the arbitrators did not award FDC anything for the cost of replacing damaged interior tile and drywall does not prove otherwise. An insurer may be obligated to defend its insured even if, at the conclusion of an underlying action, it is found to have no obligation to indemnify its insured (*see Automobile Ins. Co. of Hartford v Cook*, 7 NY3d 131, 137 [2006]; *Global Constr. Co., LLC v Essex Ins. Co.*, 52 AD3d 655, 655-656 [2008]).

The majority would nevertheless dismiss on the ground that Hartford and QBE did not receive timely notice of the underlying occurrence as required by their respective policies. I disagree.

Although there is proof that the project was plagued by leaks, it is unclear when SMA learned that the leaks had caused damage to various tenant spaces, as opposed to SMA's work product. Even if Hartford and QBE are deemed to have satisfied their prima facie burden on the late notice issue by pointing to SMA's multi-year delay in providing them with notice (*see Tower Ins. Co. of N.Y. v Classon Hgts., LLC*, 82 AD3d 632, 634 [2011]), an issue of fact exists as to whether the delay was excusable.

"[A]n insured's good-faith belief in nonliability, when reasonable under the circumstances, may excuse a delay in notifying the insurer" (*Spa Steel Prods. Co. v Royal Ins.*, 282 AD2d 864, 865 [2001] [internal quotation marks omitted]). The issue of whether an insured had a good faith belief in nonliability, and whether that belief was reasonable, ordinarily presents an issue of fact (*id.*; see also *Deso v London & Lancashire Indem. Co. of Am.*, 3 NY2d 127, 129 [1957]; *Morehouse v Lagas*, 274 AD2d 791, 794 [2000]). It is only when the facts are undisputed and not subject to conflicting inferences that an issue can be decided as a matter of law (*see Greenwich Bank v Hartford Fire Ins. Co.*, 250 NY 116, 131 [1928]).

Here, both Aurora's chief financial officer (CFO) and its vice-president averred that the first actual notice of an affirmative claim by FDC against SMA occurred when SMA received the arbitration demand in May 2004. In a signed statement, Aurora's CFO stated that "[s]ubsequent to the completion of the project, [SMA] received correspondence directed to the roofing manufacturer regarding leaks. None of the correspondence was directed to [SMA] . . . Due to the fact that Aurora was not involved with the roof construction, we felt that there was no exposure on the part of Aurora." An issue of fact exists as to whether this belief was reasonable in light of section 15.06 of the CMA, which provides that the contractors hired by SMA would assume liability and responsibility for their own work and that "in the event of any loss or damage arising out of the construction of the Project, [FDC] shall look first to those contractors for recovery of any damages"; that SMA did not "insure, guarantee or warrant" the work of the independent contractors; and that in the event of a dispute between FDC and any such contractor, SMA was obligated to assist FDC "in the preparation of any claim . . . and otherwise consult with [FDC] and the counsel about the course of those proceedings."

Given these contractual provisions, even if SMA can be charged with its agent Aurora's knowledge that there was a problem with leaks on the project, that would not establish, as a matter of law, that SMA was aware of an occurrence that would lead to a claim against it as construction manager, rather than a claim against the contractors who actually performed the work and their suppliers. For example, in the September 1999 letter cited by the majority, Aurora's project manager advised a subcontractor to notify its insurance company of the leak problem, implying that the contractor would be held accountable.

True, an August 11, 2003 letter from the project architect to

the roofing contractor, which indicates that it was copied to Vero, a managing member of SMA and principal of Aurora, did state that over 100 roof leaks had been documented and that FDC was prepared to perform repairs and bring suit against SMA and others. However, the letter does not identify SMA as a copied party and there is nothing in the record that would confirm that Vero received the copy.

The majority would disagree, stating that plaintiff "coyly" asserts that there is nothing in the record to confirm receipt by Vero, who has not submitted an affidavit, and that the affidavit of Aurora's CFO begs the question because it addresses plaintiff's receipt of a formal claim as opposed to its knowledge of an "occurrence" which may result in a claim. However, neither Hartford nor QBE offered anything that would suffice to raise a presumption that the August 11, 2003 letter was actually mailed to and received by Vero (*see Hospital for Joint Diseases v Nationwide Mut. Ins. Co.*, 284 AD2d 374 [2001]), such as a certificate of mailing or "proof of a standard office practice or procedure designed to ensure that items are properly addressed and mailed" (*Residential Holding Corp. v Scottsdale Ins. Co.*, 286 AD2d 679, 680 [2001]).

Nor do the December 4, 2003 and February 2, 2004 faxes from Aurora to its counsel establish that SMA had notice of an occurrence that could lead to a claim. The December 4, 2003 fax does not reference the August 11, 2003 letter and was sent in response to a fax from the project architect to Vero which covered the minutes of a meeting concerning roof issues. While the minutes discuss leaks, they do not place SMA on notice that FDC would seek to hold SMA, rather than the contractors or suppliers, responsible for them.

The February 2, 2004 fax was in response to a January 30, 2004 letter from the project architect to Peter Levine of FDC concerning remedial work performed and to be performed to the roof and the need "to review evidence we are going to pursue with Aurora." On February 2, 2004, Aurora forwarded that letter to counsel, noting: "It appears . . . that Airport Plaza is blaming the leaks . . . on Expressway Acoustics (Aurora) . . . Please review and determine if any action needs to be taken at this time." The vague reference to the need "to review evidence we are going to pursue with Aurora" does not provide clear-cut proof that SMA received notice that FDC would seek to hold it accountable for the roof defects. In light of the language of the CMA referenced above, the reference may have related to SMA's duty to cooperate in pursuing claims against the roofing contractors that actually did the work, not as a claim against SMA for

breach of the CMA. Indeed, even if notice to Aurora may be deemed notice to SMA, when Aurora forwarded the January 30, 2004 letter to counsel for review, it was concerned with a claim against Expressway, as a contractor that provided carpentry work on the roof for FDC, not a claim against SMA, as construction manager.

Accordingly, I would reinstate the complaint. **[Prior Case History: 26 Misc 3d 1237(A), 2010 NY Slip Op 50431(U).]**