[49 NE3d 1156, 29 NYS3d 864]

In the Matter of KEVIN AOKI et al., Petitioners, v ECHO AOKI et al., Respondents, DEVON AOKI et al., Respondents, and KEIKO ONO AOKI, Appellant.

Argued February 10, 2016; decided March 31, 2016

*Wilmer Cutler Pickering Hale and Dorr LLP*, Washington, D.C. (*Seth P. Waxman*, of the District of Columbia bar, admitted pro hac vice, *Daniel S. Volchok*, of the District of Columbia

bar, admitted pro hac vice, *Adam I. Klein*, and *Thomas G. Sprankling*, of the District of Columbia bar, admitted pro hac vice, of counsel), and *Wilmer Cutler Pickering Hale and Dorr LLP*, New York City (*Alan E. Schoenfeld* of counsel), for appellant.

*Pryor Cashman LLP*, New York City (*David C. Rose* and *Andrew M. Goldsmith* of counsel), for respondents.

*Lauro Law Firm*, New York City (*John F. Lauro* of counsel), for Alex Long and another, amici curiae.

*MoloLamken LLP*, Washington, D.C. (*Lauren M. Weinstein* of counsel), for Geoffrey C. Hazard, Jr., amicus curiae.

**OPINION OF THE COURT**

PIGOTT, J.

This appeal involves a challenge to the validity of two partial releases of testamentary powers of appointment executed by the decedent Hiroaki (Rocky) Aoki, the founder of the Benihana restaurant chain. The Appellate Division's order declaring the partial releases valid should be affirmed.

## I.

Rocky formed the Benihana Protective Trust (BPT) in 1998 to hold stock and other assets relating to Benihana. In creating the trust Rocky named his attorney, Darwin Dornbush, and

two of his children, Kevin and Kana, as trustees.[1] The trust instrument, which was prepared by attorney Norman Shaw, contained a provision that granted Rocky an unlimited power "to appoint any of the principal and accumulated net income remaining at his death," with such power of appointment being "exercisable only by a provision in [Rocky's] Will specifically referring to and exercising the power."

In July 2002, Rocky married Keiko (Ono) Aoki. Shortly after the wedding, Kevin and Kana met with Dornbush to express their concerns that Rocky had married Keiko without first having Keiko execute a prenuptial agreement. Dornbush arranged a meeting with Kevin, Kana and Rocky the following day. During that meeting, it was agreed that a potential solution to the problem was that Keiko execute a postnuptial agreement. Efforts to get Keiko to sign a postnuptial agreement, however, proved fruitless. When it became clear that Keiko would not execute such an agreement, Shaw proposed that Rocky execute a partial release of his power of appointment whereby Rocky could appoint only his descendants at the time of his death.

On September 23, 2002, Kevin, Kana and Rocky met with Dornbush. Rocky reviewed a "final draft" of the partial release (September release), and Rocky executed the partial release the following day. As relevant here, the September release provides as follows:

> "I hereby *irrevocably* partially release that power of appointment so that, from now on, I shall have only the following power:

> "*I shall have a testamentary power to appoint any of the principal and accumulated net income remaining at my death to or for the benefit of any one or more of my descendants.* My right to select appointees from among my descendants, to decide the share of the appointive property that each appointee shall receive, and to decide the terms (in trust or otherwise) upon which each appointee shall take the appointive property, shall be unlimited in all respects. My power of appointment shall be exercisable only by a provision in my Will specifi-

---

1. Another of Rocky's children, Kyle, was added as trustee in 1999. In 2004, Dornbush resigned as trustee and was replaced by attorney Kenneth Podziba. Thus, at the time this proceeding was commenced, the trustees of the BPT were Kevin, Kana, Kyle and Podziba.

cally referring to and exercising the power" (emphases supplied).

Three months later, due to changes in IRS regulations, Rocky executed a second release (December release) that further irrevocably restricted his power to appoint by excluding any descendants who were nonresident aliens.

In August 2003, Rocky retained attorney Joseph Manson to draft a codicil to his will. The codicil, which made no mention of the September or December releases, appointed Keiko to receive 25% of the trust assets upon Rocky's death, and income from the remaining 75% for the rest of her life. It also provided that upon Keiko's death, Keiko had the power to bequeath the principal to one or more of Rocky's descendants in her will.

At Manson's request, Shaw provided an opinion as to whether Rocky's exercise of the power of appointment in the codicil was valid. Shaw's opinion was that the portion of the codicil granting Keiko a beneficial interest in the trust was invalid because the September release rendered Keiko an impermissible appointee of the trust. Weeks later, Rocky executed an affidavit stating that he did not realize that, by executing the September and December releases, he could no longer leave his Benihana stock to Keiko or any other party, and, had he known that that was the effect of the documents, he would not have signed them.[2]

Four years later, in September 2007, Rocky executed a new last will and testament, whereby he attempted to exercise his power of appointment consistent with the August 2003 codicil. However, Rocky also hedged his bets, stating that if it was determined that the exercise of his power of appointment in that regard was "invalid because, contrary to my desires, the [September and December releases] are found to be valid," then he exercised his power 50% in favor of his daughter, Devon, and 50% in favor of his son, Steven.

Rocky died in July 2008, survived by Keiko and his six children. At no time prior to his death did Rocky attempt to have either the September or December releases declared invalid.

---

2. The record is unclear as to why Rocky executed this particular affidavit. It is not captioned and does not appear to have been prepared for use in an action or proceeding. Notwithstanding Rocky's contentions in this affidavit, however, four years later, Rocky conceded at his deposition that Shaw had explained to him the overall legal effect of the September release.

## II.

The BPT trustees commenced this proceeding seeking a determination as to the validity of the September and December releases. Devon and Steven interposed an answer. Keiko also answered, asserting in one of her five affirmative defenses that the releases were invalid as "the product of fraud" or having been "obtained through fraudulent devices." At the conclusion of discovery, Devon and Steven moved for summary judgment seeking an order declaring the releases valid and dismissing Keiko's affirmative defenses. Keiko opposed the motion, asserting that there was a question of fact as to whether Rocky would have signed the releases had he known that in signing them he was foreclosed from changing his mind in the future.

The Surrogate dismissed four of the affirmative defenses, but allowed the fraud affirmative defense to remain. As to that defense, the court held that there was a triable issue of fact on the issue of constructive fraud, and whether the proponents of the releases (as opposed to Keiko) could meet their burden of demonstrating that Rocky's signature on the releases was voluntary and not the result of misrepresentation or omission by attorneys Dornbush and Shaw.

The case proceeded to trial before the Surrogate, who determined that a preponderance of the evidence established that Rocky was not aware that the releases were irrevocable, and that Devon and Steven failed to meet their burden of establishing that Rocky's execution of the releases was voluntary and not the result of the "misrepresentation, omission or concealment" by Rocky's fiduciaries, Dornbush and Shaw. The Surrogate therefore decreed the September and December releases invalid.

The Appellate Division unanimously reversed the Surrogate's Court decree and declared the releases valid (117 AD3d 499, 499 [1st Dept 2014]). It ruled that the Surrogate "erroneously shifted the burden of proof to Devon and Steven to prove that the releases were *not* procured by fraud," pointing out that neither Dornbush nor Shaw were parties to the releases and therefore could not benefit from them (*see id.* at 503). The Appellate Division held that the record demonstrated that Rocky understood that the releases were irrevocable (as evidenced by his deposition testimony), and that Dornbush and Shaw never represented to Rocky that the releases were anything but irrevocable (*see id.*). Nor was there any indication that Dornbush

or Shaw "either concealed from or did not affirmatively provide Rocky with any information he needed to make an informed decision" (*id.*). And, it was of no moment that Rocky failed to ask any questions before signing the releases, because a party who signs a document without any valid excuse for not having read it is bound by its terms (*id.*).

This Court granted Keiko leave to appeal, and we now affirm.

## III.

Keiko argues that the Surrogate properly applied the constructive fraud doctrine in shifting the burden of proof to Devon and Steven to establish that the releases were not procured by fraud. According to Keiko, because Dornbush and Shaw, as fiduciaries of Rocky, allegedly worked to further the interests of other parties, the Appellate Division erred when it held that the burden of proof was on Keiko to establish that the releases were procured by fraud. We disagree.

It is a well-settled rule that " 'fraud vitiates all contracts, but as a general thing it is not presumed but must be proved by the party seeking to [be] relieve[d] . . . from an obligation on that ground' " (*Matter of Gordon v Bialystoker Ctr. & Bikur Cholim*, 45 NY2d 692, 698 [1978], quoting *Cowee v Cornell*, 75 NY 91, 99 [1878]). However, an exception to that general rule provides that where a fiduciary relationship exists between the parties, the law of constructive fraud will operate to shift the burden to the party seeking to uphold the transaction to demonstrate the absence of fraud (*see Matter of Greiff*, 92 NY2d 341, 345 [1998]). In addressing the doctrine of constructive fraud, we have explained that when

"the relations *between the contracting parties* appear to be of such a character as to render it certain that they do not deal on terms of equality but that either on the one side from superior knowledge of the matter derived from a fiduciary relation, or from overmastering influence, or on the other from weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, there the burden is shifted, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced, no undue influence was used,

and that all was fair, open, voluntary and well understood" (*Cowee*, 75 NY at 99-100 [emphasis supplied]).

We have applied the constructive fraud doctrine in different contexts, but in each one, the pertinent factor present is that the fiduciary stood to benefit from the transaction itself. For example, in *Matter of Gordon*, we held that there was a fiduciary relationship between an elderly nursing home resident and the nursing home, such that the law of constructive fraud applied and the burden of proof shifted to the nursing home to demonstrate that the resident's large donation to the nursing home was freely and voluntarily made (45 NY2d at 698-700).

In *Fisher v Bishop*, we set aside a mortgage executed by an elderly farmer, which was executed on the advice of his counsel (one Wattles) and for the satisfaction of the farmer's creditors (108 NY 25, 27-28 [1888]). In that case, the farmer's son, with the assistance of Wattles (who had also done legal work for the farmer), executed a deed and transfer of personal property by the son to the farmer to pay off debts that he owed the farmer (*see id.* at 27). The son thereafter absconded, leaving the surety defendants—Wattles and Bishop—to pay off the son's debt to a third party.[3] Wattles and Bishop obtained the bond and mortgage from the farmer after making repeated threats that the underlying transfer from the son to the farmer was fraudulent as against creditors (*see id.* at 27-28). In setting aside that transaction on the ground of undue influence, we found that there was a fiduciary relationship between the farmer and Wattles:

> "The extent to which the [farmer] confided in the defendant Wattles is clearly shown by the fact that he had frequently employed him in business transactions and that the conveyances which he then threatened to annul and overthrow were drawn by him, and accepted under his advice and cooperation. It was a gross breach of good faith for a person thus trusted, and who had by conducting the business, vouched for its validity and lawfulness, *to turn around for the purpose of gaining a personal advantage*, and assert that he had been

---

**3.** This particular fact is contained in the Appellate Division decision (*see Fisher v Bishop*, 36 Hun 112, 113 [4th Dept 1885]).

engaged in an illegal transaction, which he could at his own option annul and destroy" (*id.* at 29-30 [emphasis supplied]).

 Dornbush and Shaw were clearly Rocky's fiduciaries. But that is only one part of the equation. The critical inquiry is whether they were either parties to the releases or stood to directly benefit from their execution, such that the burden shifted to Devon and Steven to demonstrate that the releases were not procured by fraud.

Here, the only individuals who stood to benefit from Rocky's execution of the releases were his descendants. Neither Dornbush nor Shaw were parties to the releases or stood to directly benefit from their execution (*cf. Matter of Gordon*, 45 NY2d at 698-700; *Fisher*, 108 NY at 29-30). If anything, the execution of the releases all but ensured that Dornbush and Shaw would have no interest in, nor would receive any benefit from, the trust assets. Therefore, the Appellate Division correctly determined that, because the fiduciary exception does not apply in this case, the Surrogate had improperly shifted the burden of proof to Devon and Steven to demonstrate that the releases were not procured by fraud.

 In support of their motion for summary judgment, Devon and Steven submitted copies of the releases, which, on their face, state that they are irrevocable and carefully set out their legal effect, namely, that Rocky was limiting his power of appointment to his descendants who were not nonresident aliens. Devon and Steven also submitted the deposition testimony of Rocky (taken in an unrelated action) whereby Rocky admitted that he remembered signing the releases. Excerpts from the depositions of Dornbush and Shaw, the latter testifying that he explained to Rocky the significance of the releases and what they were meant to accomplish, were also submitted.

In response, Keiko submitted, among other things, the deposition transcript of Rocky whereby he conceded that Shaw had explained to him the overall purpose of the September release. In light of this submission, it is undisputed that Shaw explained the overall effect of the September release to Rocky, and that Rocky signed it. As Keiko points out, Rocky testified that he may have signed the releases without actually reading them, but that was not the result of any alleged misrepresentations or omissions by Dornbush and/or Shaw, the latter

having explained to Rocky what he was signing and receiving confirmation from Rocky that he wanted to sign the releases.[4]

Absent any evidence of fraud, one who signs a document is bound by its terms (*see Da Silva v Musso*, 53 NY2d 543, 550 [1981]). Because Keiko failed to raise a triable issue of fact that the releases were signed as a result of fraud or other wrongful conduct, the Appellate Division properly granted Devon and Steven summary judgment. Accordingly, the order of the Appellate Division should be affirmed, with costs.

STEIN, J. (dissenting). While I generally agree with the majority's articulation of the law of constructive fraud, I disagree with its application of that law to the circumstances here. In determining whether Keiko Aoki's claim of constructive fraud was properly supported, the majority frames the issue, in part, as whether Darwin Dornbush and Norman Shaw (the attorneys) "were parties to the releases or stood to directly benefit from their execution" (majority op at 41). Regarding that same element, however, Keiko raised another possibility— that the attorneys acted as agents of two of Rocky Aoki's children, Kevin and Kana Aoki (who, in turn, stood to benefit from the releases), when the attorneys allegedly breached their fiduciary duty to Rocky (*see generally Kirschner v KPMG LLP*, 15 NY3d 446, 465, 468 [2010] [acts of agents are imputed to their principals]). In my view, the existence of such an agency relationship would, if proved, bring this case within the doctrine of constructive fraud.

Initially, we must be cognizant of the procedural posture of this case and the burdens of proof attendant thereto. While Surrogate's Court ultimately held a full bench trial after denying Devon and Steven Aoki's motion for summary judgment, the Appellate Division's reversal of the order of Surrogate's Court was limited to its determination of the summary judgment motion; the Appellate Division did not reach the trial evidence or the Surrogate's decision after trial. Thus, our review is necessarily so limited, as well. Accordingly, the ques-

---

4. Keiko's contention that Dornbush and Shaw had formed an attorney-client relationship with Kevin and Kana when the releases were signed, such that the attorneys were "effective parties" to the releases, is without merit. The record establishes that Dornbush and Shaw executed the releases at Rocky's direction. Moreover, Keiko's assertion that Dornbush and Shaw possessed an "interest" in the transaction because they allegedly expected to receive profitable business from the children in the future is mere speculation.

tion before this Court is whether, as the Appellate Division found, Devon and Steven met their initial burden of establishing their entitlement to judgment as a matter of law and, if so, whether Keiko presented sufficient evidence to raise a triable question of fact in opposition (*see Vega v Restani Constr. Corp.,* 18 NY3d 499, 503 [2012]). I agree with the majority's conclusion as to the first part of that inquiry, but not the latter.

Pursuant to the law of constructive fraud, when a fiduciary relationship exists between the parties, the burden shifts from the party attempting to establish fraud to the party seeking to uphold the transaction, who then must demonstrate the absence of fraud (*see Matter of Greiff,* 92 NY2d 341, 345 [1998]; *Matter of Paul,* 105 AD2d 928, 929 [3d Dept 1984]). There can be no question in this case that the attorneys stood in a fiduciary relationship to Rocky, and I concur with the majority's conclusion that there is no proof that they were, themselves, parties to the transaction or that they stood to gain, personally, from the execution of the releases. However, in my view, when we consider the evidence in a light most favorable to Keiko, as we must because she is the nonmoving party (*see Vega,* 18 NY3d at 503), a question of fact exists on the summary judgment record as to the attorneys' possible agency relationship with Rocky's children—who did stand to gain from the releases—such that the burden shifted to the children to establish the absence of fraud. Because that burden was not met, summary judgment was inappropriate.

Keiko asserts that the attorneys drafted the releases based on the wishes of Kevin and Kana—and thereby entered into an attorney-client relationship with them—rather than acting at the insistence of, and in the sole best interests of, their client Rocky. Although Keiko argues that the attorneys suffered from an impermissible conflict of interest if they represented both Rocky and the children, for our purposes here we need not make any such determination, as it is irrelevant whether an actual attorney-client relationship was formed with the children. That is, in the context of this summary judgment motion, even if the relationship was not one of attorney and client, the evidence was sufficient to create questions of fact as to whether the attorneys drafted the releases for the benefit of the children, rather than for Rocky, and, if they were acting for the children's benefit, whether they should be considered agents for a party to the transaction and, thus, fall within the constructive fraud doctrine.

In this regard, the record reflects several instances of conflicting evidence with respect to the nature of the relationship between the attorneys and Rocky's children and, ultimately, whether the releases should be set aside as the product of improper conduct by the attorneys. For example, Dornbush testified at his deposition that, after Keiko refused to sign a postnuptial agreement, Kevin and Kana asked him and Shaw if anything could be done to protect the business for the children. Dornbush admitted that he was receptive to their concerns, although he was not sure if they sought legal advice, business advice, or "parental" advice because they considered him to be like an uncle. Shaw testified that he performed some legal work for Kevin and Kana as trustees, as well as for Kana, individually.

According to Shaw's deposition testimony, the attorneys' aim in generating possible solutions to Keiko's refusal to sign a postnuptial agreement was to assuage concerns being raised by the children, both directly and as transmitted through Rocky, that Rocky's assets would be vulnerable to Keiko after his death. Shaw acknowledged that he formulated the idea for the releases, purportedly for the purpose of relieving family strain caused by the lack of a prenuptial agreement, without consulting with Rocky or anyone else other than Dornbush. Shaw further testified that he may have had a conversation with Kevin about relieving this family strain. In a September 13, 2002 outline for a meeting with Rocky, Shaw listed several options, including a postnuptial agreement and releases, to insulate Rocky against pressure to appoint shares away from the children; it is unclear who asked the attorneys for these options, or who mentioned this supposed pressure on Rocky. Shaw also testified that he and Dornbush represented Rocky *and* the children, but that the attorneys saw a potential conflict once Rocky's new lawyer asked them to review the proposed codicil to Rocky's will for validity. When questioned about the September 2002 release, Dornbush testified that he did not have any notion as to whether or not it was beneficial to Rocky; this raises a question as to why he would have had his client sign such a document. In addition, Dornbush wrote in a memo that "fur will fly" when Rocky and Keiko discovered the existence of the executed releases, suggesting that Dornbush believed that Rocky was unaware of the releases, or at least their meaning, even though he had signed them.

As further evidence that the attorneys may not have been acting on Rocky's behalf in the drafting and execution of the

releases, Keiko points to the statement in Rocky's will that it would be "contrary to [his] desires" for the releases to be found valid. In addition, Rocky's affidavit stated that he did not understand that, after he signed the releases, he would be unable to change his will to select his wife or any unrelated person as a stock beneficiary, and that he never intended to limit his ability to makes those choices. While the majority aptly notes the suspect nature of that affidavit—and the same can arguably be said about some of the other evidence—it is beyond cavil that courts are not at liberty to make credibility determinations or weigh evidence on a summary judgment motion (*see Vega*, 18 NY3d at 505; *Forrest v Jewish Guild for the Blind*, 3 NY3d 295, 315 [2004]; *Bliss v State of New York*, 95 NY2d 911, 913 [2000]).

To be sure, nothing in the record provides uncontroverted proof that the attorneys drafted, and arranged to have Rocky execute, the releases at the behest of the children, only, and in the absence of a request by Rocky. In fact, there is some evidence to indicate that Rocky was present at all of the meetings attended by Kevin and Kana, perhaps demonstrating that the attorneys were not in an attorney-client or agency relationship with the children, but met with them only in furtherance of their professional and fiduciary obligations to Rocky. Nevertheless, all of the conflicting evidence, considered together, is sufficient to create a triable question of fact regarding whether the attorneys were acting on behalf of—or as agents of—the children, and not Rocky, when they drafted the releases and supervised their execution (*see McLenithan v McLenithan*, 273 AD2d 757, 758-759 [3d Dept 2000]; *Matter of Paul*, 105 AD2d at 930). Accordingly, I would reverse the Appellate Division order granting summary judgment to Devon and Steven Aoki, and remit the case to that Court for a review of the Surrogate's decision after trial.*

Chief Judge DiFIORE and Judges ABDUS-SALAAM, FAHEY and GARCIA concur; Judge STEIN dissents in an opinion in which Judge RIVERA concurs.

Order affirmed, with costs.

---

* In light of the Appellate Division's determination on the summary judgment motion, that Court never addressed the trial evidence or the Surrogate's decision after trial, although it had been asked to do so. Thus, it would be appropriate for the Appellate Division to conduct such a review based on the full trial record.